DALE L. HELMIG,                           )
                                          )
            Petitioner,                   )
                                          )
       v.                                 )        No. 4:02 CV 574 DDN
                                          )
MIKE KEMNA,                               )
                                          )
            Respondent.                   )

## MEMORANDUM

This action is before the court upon the petition of Missouri state prisoner Dale Helmig for a writ of habeas corpus (Doc. 26) pursuant to 28 U.S.C. § 2254. The parties have consented to the exercise of jurisdiction by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). An evidentiary hearing was held on Ground 9 on September 20, 2005.

## I.  BACKGROUND

On March 9, 1996, in the Circuit Court of Gasconade County, Missouri, petitioner Dale L. Helmig was found guilty by a jury of the first degree murder of his mother, Norma Helmig. (Doc. 7, Ex. B at 7.) On May 20, 1996, he was sentenced to life imprisonment in the Missouri Department of Corrections without the possibility of parole or probation. (Id. at 9.)

On May 23, 1996, petitioner appealed to the Missouri Court of Appeals. (Id. at 203.) His primary argument was that the evidence was not sufficient to submit the case to the jury. (Id. Ex. E.) Petitioner also alleged trial errors due to media influence. (Id.) The Missouri Court of Appeals affirmed the judgment on July 22, 1997. (Id.) On September 30, 1997, the Missouri Supreme Court denied transfer of petitioner's direct appeal. (Id. Ex. F.) His state court judgment did not become final until the conclusion of the 90-day period for filing a writ of certiorari with the United States Supreme Court on December 29, 1997.

On December 19, 1997, petitioner moved for post-conviction relief under Missouri Supreme Court Rule 29.15 in the circuit court. (<u>Id.</u> Ex. H at 8-13.) On April 20, 1998, petitioner submitted an amended Rule 29.15 motion through his attorney. (<u>Id.</u> Ex. H at 14-91.) He alleged thirteen claims of ineffective assistance of counsel, one claim of violation of his right to a speedy trial, and one claim of violation of due process by ex parte communication. (<u>Id.</u> at 92-115.) An evidentiary hearing was held on December 10, 1998, and the circuit court denied his Rule 29.15 motion on April 12, 1999. ( <u>Id.</u> at 92-115.)

On April 22, 1999, petitioner appealed the denial of his Rule 29.15 motion in the Missouri Court of Appeals. (<u>Id.</u> at 116.) The Missouri Court of Appeals affirmed the circuit court's findings on January 23, 2001. (<u>Id.</u> Ex. L.)

On February 7, 2001, petitioner filed a motion in the Missouri Court of Appeals asking for rehearing or transfer to the Missouri Supreme Court. (Doc. 17 Ex. M.) The Missouri Court of Appeals denied this request on March 19, 2001. ( <u>Id.</u> Ex. N.)

Petitioner then moved for transfer to the Missouri Supreme Court on April 3, 2001. (<u>Id.</u> Ex. O.) The Missouri Supreme Court issued its judgment denying the motion on April 24, 2001. ( <u>Id.</u> Ex. Q.)

On April 22, 2002, petitioner Helmig filed his pro se petition for a writ of habeas corpus in this court. On August 11, 2003, petitioner, through counsel, filed an amended petition alleging nine grounds for relief:

(1)    The state failed to produce sufficient evidence of his guilt beyond a reasonable doubt.

(2)    Defense counsel rendered ineffective assistance of counsel due to a conflict of interest arising from his simultaneous representation of Ted Helmig, the victim's husband, in probate proceedings.

(3)    Defense counsel rendered ineffective assistance of counsel with respect to the following:

    A.    Counsel failed to interview and present alibi witnesses.

    B.    Counsel failed to introduce evidence to rebut the suspicion cast on petitioner's knowledge and actions.

C. Counsel failed to present evidence showing petitioner maintained a close and loving relationship with the victim.

D. Counsel failed to investigate and present evidence implicating petitioner's father Ted Helmig as the victim's murderer.

E. Counsel introduced "inflammatory, gruesome evidence" at trial, and pursued a "patently ridiculous defense that [the victim's] death was the product of accidental drug overdose, thereby opening the door for otherwise inadmissible evidence that [petitioner] and his mother had argued over money."

F. Counsel failed to conduct a reasonable investigation or pursue a reasonable strategy prejudicing petitioner who otherwise would have been acquitted.

(4) The trial jurors were exposed to inflammatory press coverage and media interviews.

(5) Defense counsel rendered ineffective assistance of counsel for failing to preserve and argue on appeal the state's prejudicial use of evidence that, at the time of his arrest, petitioner was in possession of weapons unrelated to the offense.

(6) The prosecution suppressed the statements of Tina Ridenhour that the victim was in fear of her husband, Ted Helmig, and that petitioner was concerned for her safety.

(7) The prosecution and a Gasconade County Circuit Court judge had ex parte communications with Judge Brackman, the judge to whom petitioner's case was originally assigned, urging him to recuse himself from petitioner's trial.

(8) Petitioner was not able to assist in his own defense, confront witnesses against him, and make an informed, knowing, and voluntary waiver of his right to testify, due to his defense counsel providing him prescription medication and instructing him to take it during trial.

(9) During jury deliberations, without the knowledge of petitioner or his counsel, a deputy sheriff gave the jury a map, which had not been introduced into evidence and which was relied upon by the jury to resolve significant questions regarding the state's case.

- 3 -

## II. Statute of Limitations

Respondent argues that petitioner's federal habeas corpus petition must be dismissed because it does not comply with the statute of limitations contained in 28 U.S.C. § 2244(d)(1). The court disagrees. Section 2244(d)(1) provides: "A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). For petitioner's case, the statute of limitations began to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Id. at (d)(1)(A). Furthermore, the statute also contains a tolling provision that excludes from the one-year limitations period the time during which an application for state post-conviction or other collateral review is "pending" in the state courts. Id. at (d)(2).

On September 30, 1997, when the Missouri Supreme Court denied transfer of his direct appeal, petitioner had ninety days to file a petition for a writ of certiorari in the Supreme Court of the United States. See Nichols v. Bowersox, 172 F.3d 1068, 1072 (8th Cir. 1999) (en banc). Since he did not file a petition for writ of certiorari, his conviction became final on December 29, 1997. Petitioner filed his Rule 29.15 motion on December 19, 1997. Therefore, the statute of limitations did not start running until the conclusion of his state post-conviction proceedings.

Respondent argues that the one-year limitations period started to run on January 23, 2001, when the Missouri Court of Appeals denied rehearing. Thus, petitioner's federal habeas corpus petition, which was filed on April 22, 2002, is untimely. According to respondent, the period from January 23, 2001, until April 24, 2001, when the Missouri Supreme Court denied transfer, should not be tolled because petitioner was pursuing an extraordinary remedy.

"[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v.

Boerckel, 526 U.S. 838, 845 (1999).  Extraordinary remedies that are outside the standard review process do not have to be invoked and do not qualify for tolling the federal habeas limitations period.  Id. at 844. In October 2001, after it denied transfer of petitioner's case to it, the Missouri Supreme Court amended Missouri Supreme Court Rule 83.04 (effective July 1, 2002) to add that transfer by the court of appeals after issuing its decision is an extraordinary remedy and not part of the ordinary review process for federal habeas corpus purposes.  Mo. S. Ct. R. 83.04; see also Randolph v. Kemna, 276 F.3d 401, 404 (8th Cir. 2002) ("[T]he amendment to Rule 83.04 constitutes an unequivocal statement about where Missouri's 'one complete round of the state's established appellate review process' stops").  Respondent argues that any extraordinary remedy that is outside the ordinary review process should toll the limitations period.

In Carey v. Saffold, 536 U.S. 214, 219-20 (2002), the Supreme Court determined that a post-conviction motion "is pending as long as the ordinary state collateral review process is 'in continuance'-- i.e., 'until the completion of' that process.  In other words, until the application has achieved final resolution through the State's post-conviction procedures, by definition it remains 'pending.'"  Id. at 220. When the Missouri Court of Appeals denied rehearing in January 2001, the Rule 83.04 amendment had not occurred, much less gone into effect. Accordingly, respondent cannot rest his statute of limitations argument on the mere fact that the version of Rule 83.04, as of July 2002, characterizes appeal to the Missouri Supreme Court as "extraordinary."

Moreover, in Dixon v. Dormire, 263 F.3d 774 (8th Cir. 2001), the court, in applying the Supreme Court's holding in O'Sullivan to Missouri law, held

> that the exhaustion principle announced in O'Sullivan-- that a state prisoner must exhaust discretionary review of the state's highest court unless that review has been declared not to be part of the state's ordinary appellate process--requires Missouri prisoners to seek a transfer for discretionary review by the Supreme Court of Missouri because Missouri law has not removed discretionary review from its ordinary and established appellate review process.

Id. at 780.

After <u>Dixon</u>, in <u>Randolph</u>, 276 F.3d 401, the court, discussing both <u>O'Sullivan</u> and <u>Dixon</u>, recognized the amendment to Rule 83.04 clearly set forth that transfer to the Missouri Supreme Court was not part of the ordinary review process. <u>Id.</u> at 404. However, the Eighth Circuit further noted that the Rule 83.04 amendment was merely the embodiment of already existing practice and did not reflect a change in Missouri law; <u>i.e.</u>, transfer to the Missouri Supreme Court was never part of the state's standard review process. <u>Id.</u> at 404-05. The Eighth Circuit recognized this holding contradicted <u>Dixon</u>, noting "[i]n <u>Dixon</u>, we examined the language of Missouri's party transfer rule in light of <u>O'Sullivan</u> and held that in order to exhaust state remedies, Missouri law required prisoners to pursue discretionary review by petitioning for transfer to the Missouri Supreme Court. In short order the Missouri Supreme Court has made it clear that the law of Missouri is otherwise." <u>Id.</u> at 404.

Given that petitioner moved for Missouri Supreme Court review before <u>Dixon</u>, the amendment to Rule 83.04, and <u>Randolph</u>, the time during which petitioner sought transfer to the Missouri Supreme Court should be excluded from the one-year limitations period. Petitioner's habeas corpus petition was timely filed on April 22, 2002.

## II. EXHAUSTION OF STATE REMEDIES AND PROCEDURAL BAR

In order for a state prisoner to obtain federal court review under § 2254, he must have fully exhausted all remedies available in the state courts for each ground he intends to present in federal court. 28 U.S.C. § 2254(b); <u>Coleman v. Thompson</u>, 501 U.S. 722, 731 (1991); <u>Sloan v. Delo</u>, 54 F.3d 1371, 1381 (8th Cir. 1995), <u>cert. denied</u>, 516 U.S. 1056 (1996). State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the state's established appellate review process in order to proceed on a federal habeas corpus claim. <u>O'Sullivan</u>, 526 U.S. at 845. A failure to raise a claim in the state courts with a consequent default of the state court procedures, because Missouri courts do not permit successive post-conviction relief motions, <u>see</u> <u>Lindner v. Wyrick</u>, 644 F.2d 724, 726-27 (8th Cir.), <u>cert. denied</u>, 454 U.S. 872 (1981), erects a

procedural bar to relief in federal court. <u>Sweet v. Delo</u>, 125 F.3d 1144, 1149-51 (8th Cir. 1997), <u>cert. denied</u>, 523 U.S. 1010 (1998).

Petitioner may avoid the procedural bar to federal habeas review, if he can demonstrate legally sufficient cause for the default and actual prejudice resulting from it, or if he can demonstrate that failure to review the claim would result in a fundamental miscarriage of justice. <u>Coleman</u>, 501 U.S. at 750.

Respondent argues that petitioner has procedurally defaulted on grounds 3E, 5, 6, 7, and 9.

## A.    Ground 3E

Ground 3E alleges that petitioner's trial counsel rendered ineffective assistance of counsel for introducing "inflammatory, gruesome evidence and for pursuing the patently ridiculous defense that [the victim's] death was the product of accidental drug overdose, thereby opening the door for otherwise inadmissible evidence that [petitioner] and his mother had argued over money." (Doc. 26 at 39.) Respondent argues that this ground is barred, because petitioner did not raise it in the post-conviction proceedings. (Doc. 33 at 7.) Petitioner responds that the issue of counsel presenting evidence about the victim's body and pursuing accidental death was briefed extensively and addressed by the state courts.

A review of the state post-conviction motions and decisions reveals numerous instances where petitioner alleged trial counsel was ineffective for pursuing this particular defense and for introducing evidence about the body and its condition. (Doc. 7, Ex. H at 47-48, 60, 94, 103, 107; Ex. I at 1, 12, 16-18, 20-21, 55.) Moreover, petitioner alleged in post-conviction motions that trial counsel was ineffective for failing to object to the testimony regarding money and petitioner's arguments with the victim as hearsay. (Doc. 7, Ex. H at 69-72; Ex. I at 64-68.)

As respondent argues, however, there is no allegation by petitioner that, but-for counsel's particular evidentiary presentation and defense theory, the state's evidence of motive would have been irrelevant and thus inadmissible. This precise issue was never before the state court

and is procedurally barred unless petitioner has made a sufficient showing of cause and prejudice or that a fundamental miscarriage of justice would occur if the court does not address the merits of the claim.

**B.   Ground 5**

Ground 5 alleges that plaintiff's "trial and appellate counsel was ineffective . . . for failing to preserve and argue on appeal the state's prejudicial use of evidence that petitioner at the time of his arrest was in possession of weapons unrelated to the offense." Respondent argues this ground is procedurally defaulted, with respect to appellate counsel, because it was not raised in his pro se or amended post-conviction relief motion, or his appeal from denial of post-conviction relief. (Doc. 33 at 8.)

Review of petitioner's amended Rule 29.15 motion reveals that he raised this issue with regard to trial counsel. (Doc. 7, Ex. H at 57.) However, respondent is correct that petitioner failed to raise Ground 5 as it relates to appellate counsel in the post-conviction relief appeal. (Doc. 7, Ex. I at 38-41.) Accordingly, this issue is procedurally barred unless petitioner has made a sufficient showing of cause and prejudice or that a fundamental miscarriage of justice would occur if the court does not address the merits of the claim.

**C.   Ground 6**

The record is clear that petitioner failed to present his claim that "the prosecution suppressed material evidence of Tina Ridenhour that Mrs. Helmig was in fear of her husband, Ted Helmig, and that her son was concerned for her safety." (Doc. 33 at 8; Doc. 7, Exs. H, I.) Moreover, the appellate court declined to reach the merits of this claim, as it had not been raised before the circuit court in his pro se or amended motion for post-conviction relief. Helmig v. State, 42 S.W.3d 658, 681 (Mo. App. 2001) ("In actions under Rule 29.15, any allegations or issues that are not raised in the Rule 29.15 motion are waived on appeal.") (internal citation omitted). Therefore, this issue is barred from review unless petitioner has made a sufficient showing

of cause and prejudice or that a fundamental miscarriage of justice would occur if the court does not address the merits of the claim.

## D.   Ground 7

In Ground 7 petitioner alleges that his constitutional rights were violated when the state initiated an ex parte communication with Judge Brackman, urging him to recuse himself from this case.  (Doc. 26 at 80-85.)  Respondent argues that petitioner failed to advance this claim on appeal from the denial of his post-conviction motion.  (Doc. 33 at 9.)  In his traverse, petitioner concedes that he failed to appeal this claim, thus erecting a procedural bar for review unless he has made a sufficient showing of cause and prejudice or a fundamental miscarriage of justice.  (Doc. 40 at 54-55.)

## E.   Ground 9

Petitioner's amended petition raised Ground 9, which was not raised in his original petition.  (Doc. 26 at 90.)  Ground 9 alleges that the deputy sheriff gave the jury a map during jury deliberations which had not been admitted into evidence at trial.  (Id. at 90-91.)  Respondent asserts that even with the statute of limitations running on April 25, 2001, Ground 9 is untimely.  (Doc. 33 at 13.)  Thus, it can only be considered on its merits if "it relates back" to the original petition. See Fed. R. Civ. P. 15(c)(2).

While petitioner concedes that Ground 9 does not relate back to the original petition, he asserts that it is not time-barred.  (Doc. 40 at 57-59.)  Petitioner relies on 28 U.S.C. § 2244(d) to argue that the statute of limitations should not begin to run on Ground 9 until the date on which it "could have been discovered through due diligence." 28 U.S.C. § 2244(d)(1)(D).  The phrase "due diligence" is mentioned in §§ 2244 and 2254, but is not defined by statute.  Construing the opening clause of § 2254(e)(2), in Williams v. Taylor, 529 U.S. 420 (2000), the Supreme Court held that due diligence "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend, . . . upon whether those efforts could have been successful."

<u>Williams</u>, 529 U.S. at 435. According to petitioner, nothing in the trial record would have put him on notice that during deliberations, someone gave the jury a map that had not been admitted into evidence. (Doc. 40 at 58.) Thus, Ground 9 could not have been uncovered by the Supreme Court's definition of "due diligence" until its discovery by "happenstance" in the summer of 2003.

"[T]he burden is on the petitioner to persuade the court that he has exercised due diligence," and he has not "slept on his rights." <u>Frazier v. Rogerson</u>, 248 F. Supp. 2d 825, 833 (N.D. Iowa 2003). "In construing and applying this phrase, courts appear to require that the petitioner 'show some kind of measure of prudence, activities or assiduity as may be properly expected from and ordinarily exercised by a reasonable and prudent person under the particular circumstances present.'" <u>Id.</u> at 833 (quoting <u>Wims v. United States</u>, 225 F.3d 186, 190 (2nd Cir. 2000)); <u>United States v. Zuno-Arce</u>, 25 F. Supp. 2d 1087, 1097-98, 1110-13 (C.D. Cal. 1998), <u>aff'd</u>, 209 F.3d 1095, 1098, 1102-03 (9th Cir. 2000).

Petitioner states his counsel discovered the issue by "happenstance" when investigating unrelated issues. (Doc. 26 at 90.) From the evidence adduced at the hearing held in this court on September 20, 2005, the court finds that in June 2003 Mark Thomason, then a legal intern in the office of petitioner's federal habeas counsel, investigated issues relating to petitioner's trial. On June 26, 2003, Thomason interviewed juror Stanley Dahl. During this interview, it was learned for the first time that during deliberations the jury requested, was provided by sheriff's personnel, and considered a road map that had not been part of the trial evidence.[1]

While discovery by happenstance alone does not meet petitioner's burden of showing due diligence, considering the totality of the circumstances which includes the other grounds alleged by petitioner, the court concludes petitioner was duly diligent in his efforts to discover and develop his habeas claims. <u>See</u> <u>Frazier</u>, 248 F. Supp. 2d at 833 ("The phrase 'due diligence' is not defined anywhere in the

---

[1]<u>See</u> the factual findings of this court set forth with respect to Ground 9, <u>infra</u>.

AEDPA, but should be considered in light of the 'totality of the circumstances' present . . . ."").

This is not a case where petitioner has "slept on his rights" and failed to engage in an appropriate, reasonable inquiry into the circumstances surrounding his trial and subsequent post-conviction petitions. While the factual predicate for petitioner's claim possibly could have been discovered during the original one-year limitations period, it is unreasonable to construe § 2244(d)(1)(D) to require prisoners to "scorch the earth" for any and all possible habeas grounds. Neither party nor the record provides any evidence that petitioner was alerted or should have discovered that additional information was provided to jurors that had not been introduced at trial.

Accordingly, the court finds that the totality of petitioner's actions evidences a diligent inquiry into the facts and circumstances supporting his claim for habeas relief that did not, until the summer of 2003, reveal the circumstances supporting Ground 9. The court will therefore address the merits of this claim as allowed under § 2244(d)(1)(D).

**F.    Overcoming the Procedural Bar**

To establish cause for a procedural default, petitioner must demonstrate that some factor impeded his efforts to comply with state procedural requirements. <u>Coleman</u>, 501 U.S. at 750-52. Legally sufficient cause for a procedural default must be based upon an objective factor, external to the petitioner and his case, which impeded petitioner or his counsel from properly presenting the subject claims to the Missouri courts. <u>Wainwright v. Sykes</u>, 433 U.S. 72, 81 (1977); <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986).

In all the aforementioned grounds except ground 9, petitioner has not proffered any fact or circumstance, external to his efforts, which would have prevented him from complying with both Missouri's and this court's procedural rules. Accordingly, petitioner fails to show cause and prejudice to overcome the procedural bar.

Petitioner may also overcome a procedural bar by showing that a fundamental miscarriage of justice would occur, if the court did not

consider the ground, because he is actually innocent.  <u>Murray</u>, 477 U.S.
at 495-96.  A habeas petitioner asserting actual innocence must support
his allegations of actual innocence with new, reliable evidence, <u>Schlup
v. Delo</u>, 513 U.S. 298, 324 (1995), and "the petitioner must establish
that it is more likely than not that no reasonable juror would have
convicted him in light of the new evidence."[2] <u>Weeks v. Bowersox</u>, 119
F.3d 1342, 1351 (8th Cir. 1997) (en banc), <u>cert. denied</u>, 522 U.S. 1093
(1998).  "[E]vidence is new only if it was not available at trial and
could not have been discovered earlier through the exercise of due
diligence."  <u>Amrine v. Bowersox</u>, 238 F.3d 1023, 1028 (8th Cir. 2001)
(quoting <u>Amrine v. Bowersox</u>, 128 F.3d 1222, 1230 (8th Cir. 1997) (en
banc)); <u>Johnson v. Norris</u>, 170 F.3d 816, 818 (8th Cir. 1999).

"Without any new evidence of innocence, even the existence of a
concededly meritorious constitutional violation is not in itself
sufficient to establish a miscarriage of justice that would allow a
habeas court to reach the merits of a barred claim."  <u>Schlup</u>, 513 U.S.
at 316.  "However, if a petitioner . . . presents evidence of innocence
so strong that a court cannot have confidence in the outcome of the
trial unless the court is also satisfied that the trial was free of
nonharmless constitutional error, the petitioner should be allowed to
pass through the gateway and argue the merits of his underlying claims."
<u>Id.</u>

Reviewing the totality of petitioner's proffer, the court finds he
has not established actual innocence based on new and reliable evidence.
Petitioner does not specifically characterize particular facts as "new

_____

[2]      To ensure that the fundamental miscarriage of
         justice exception would remain "rare" and be
         applied only in the "extraordinary case," while at
         the same time ensuring that relief would be
         extended to those who are truly deserving, the
         [Supreme] Court has explicitly tied the exception
         to the petitioner's innocence.  [The Court has]
         also expressed the standard of proof that should
         govern consideration of such claims:      The
         petitioner must show that the constitutional error
         "probably" resulted in the conviction of one who
         was actually innocent.

<u>Schlup</u>, 513 U.S. at 299.

and reliable evidence," but instead refers to all the evidence provided in support of his habeas application. Petitioner's amended habeas corpus petition and traverse refer to the following:

1.  The March 6, 1994, Report of Trooper Robert Westfall memorializing petitioner's statement that "he did not murder his mother." (Doc. 40, Ex. 9 at 2.)

2.  Affidavits alleging petitioner had a good relationship with his mother that was free from discord, and that he attempted to contact his mother by phone on July 28, 1993, to check on her well-being due to rising flood waters on the Mississippi River. (Doc. 26, Exs. 19, 21-23, 28-31, 33.)

3.  Affidavit alleging plaintiff was seen at the La Casa Restaurant in Jefferson City, Missouri at 10:30 or 11:00 a.m. on July 29, 1993, and was acting "normal and well-rested" and happy about having a visit over the weekend with his children at his mother's house. (Doc. 26, Ex. 31.) Trial testimony only included petitioner's visit to La Casa at 3:30 or 4:00 p.m. on July 29.

4.  The application for a restraining order that the victim obtained against Ted Helmig included allegations of physical and mental abuse, and that the restraining order prevented Ted Helmig from "molesting and disturbing the peace of . . . Norma Helmig . . . .," and prevented him from entering her residence. (Doc. 26, Ex. 1 at 13, 36.) Trial testimony only included a reference to the portion of the restraining order that prevented Ted Helmig from transferring, selling, or disposing of property.

5.  Ted Helmig was seen at the same bar and at the same time as the victim on the evening of Wednesday July 28, 1993. (Doc. 26, Exs. 19-20.)

6.  Tina Ridenhour would testify that the victim was afraid of Ted Helmig, and accordingly, carried a handgun. (Doc. 40 at 53-54.)

7.  Stacey Medlock would have testified, had she been asked during her trial testimony, that she did not believe petitioner committed the murder, that he invited her to meet his mother on the night he determined the victim was missing, and that it was petitioner's idea to contact the Sheriff. (Doc. 26 at 13; Doc. 26, Ex. 38 at 188, 203, 207.)

8.  Other family members remarked that the victim was in her nightgown, that the victim kept her keys in her purse, and that the state of the victim's home was unusual. (Doc. 26 at 13-17.)

9. Petitioner's brother would have testified that petitioner's reaction when he was told his mother's body was recovered was his typical reaction when "terribly upset." (Doc. 26 at 18.)

10. On August 1, 1993, Ted Helmig refused to provide a suspect statement asserting his Fifth Amendment Privilege.

(Doc. 26 at 32.)

Arguably, this evidence may have benefitted petitioner had it been before the jury. However, it is neither "new" nor reflective of petitioner's innocence. There is no suggestion or inference that this information was unavailable at or before petitioner's trial. On the contrary, each affidavit detailing proposed witness testimony provides that the affiant was ready and able to testify at trial, but, for various reasons, he or she was not summoned to testify or was not asked to divulge the aforementioned testimony while testifying.

The fact that petitioner appeared to third parties to have had a harmonious relationship with the victim is not of itself indicative of innocence. Moreover, the fact that certain information casts suspicion on petitioner's father and a volatile relationship between the father and the victim is not reflective of petitioner's actual innocence. While portions of the proffered evidence account for petitioner's whereabouts, none of the relevant evidence provides petitioner an alibi during the time period the crime supposedly took place.

For these reasons, Grounds 3E, and 5, 6, and 7 are procedurally barred from this court's substantive review.

### III. STANDARD FOR REVIEW ON THE MERITS

This court's review of a state court decision is limited to situations when adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;

or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

- 14 -

28 U.S.C. § 2254(d)(1)-(2). "A state court's decision is contrary to clearly established law 'if the controlling case law requires a different outcome either because of factual similarity to the state case or because general federal rules require a particular result in a particular case.'" Tokar v. Bowersox, 198 F.3d 1039, 1045 (8th Cir. 1999) (quoting Richardson v. Bowersox, 188 F.3d 973, 977-78 (8th Cir. 1999), cert. denied, 529 U.S. 1113 (2000)), cert. denied, 531 U.S. 886 (2000). The issue a federal habeas court faces when deciding whether a state court unreasonably applied federal law is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 365.

## A.    Ground 1

Petitioner argues that the state failed to produce sufficient evidence to establish beyond a reasonable doubt that he was involved in the death of the victim.

In reviewing a claim of insufficiency of evidence, "it is well settled that upon habeas corpus the court will not weigh the evidence." Herrera v. Collins, 506 U.S. 390, 401 (1993). "Federal courts are not forums in which to relitigate state trials." Id. The standard of review does not "permit a court to make its own subjective determination of guilt or innocence," id. at 402, or "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Id. at 401 (emphasis in original). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. Furthermore, federal habeas courts "must accord 'great deference' where a state appellate court has found the evidence supporting the conviction." Hill v. Norris, 96 F.3d 1085, 1088 (8th Cir. 1996).

To support petitioner's conviction for first degree murder, the state needed to prove that he "(1) knowingly (2) caus[ed] the death of another person (3) after deliberation." State v. Morris, 844 S.W.2d 549, 551 (Mo. App. 1992); see also Mo. Rev. Stat. § 565.020.1.

"Deliberation" is defined as "cool reflection for any length of time no matter how brief." § 565.002(3).

Undoubtedly, the evidence in petitioner's case was purely circumstantial, _i.e._, does not directly prove a fact but gives rise to a logical inference that the fact exists. State v. Harris, 807 S.W.2d 528, 529 (Mo. App. 1991). When the state has laid out only circumstantial evidence, the circumstantial evidence test must apply. "The three-pronged test requires that proffered circumstances and facts coincide with each other, comport with a hypothesis of guilt, and exclude every reasonable hypothesis of innocence." State v. Luna, 800 S.W.2d 16, 19 (Mo. App. 1990).

At trial the state laid out its theory that petitioner "knew too much too soon." (Doc. 7, Ex. A-6 at 1144-45.) According to the state, petitioner had a motive to kill the victim because of their recent argument over a $200 telephone bill and the victim's statement that she was "tired of being his meal ticket." (_Id._, Ex. A-3 at 456-58; Ex. A-6 at 1059.) Petitioner's trial counsel argued to the jury that the medical experts testified it was possible the death was natural, that there was no evidence of trauma, and that she could have died of a drug overdose. (_Id._, Ex. A-6 at 1155-76.)

The evidence presented at trial included the fact that, before the victim's body was found, petitioner predicted that her keys would be in her purse. When her purse was found, the keys were inside. (_Id._, Ex. A-4 at 626.) According to the testimony of her sister, Dorothy Bauer, the victim always carried her keys hanging from a chain on the side of her jeans and never put them in her purse. Petitioner also accurately foretold that the victim would be found in her nightgown and was even able to pinpoint it to the "white one with blue flowers." (_Id._, Ex. A-6 at 1144; Ex. A-3 at 495.) According to the state, petitioner killed the victim because, "how could you possibly know what nightgown your mother would be found in." (_Id._, Ex. A-6 at 1144.)

The victim was last seen alive on Wednesday night, July 28, 1993. On Wednesday evening, petitioner called Dorothy Bauer, his aunt, and spoke to her husband, Alex Bauer. Petitioner said he was looking for the victim and told Alex Bauer that he was on his way to her house.

(Id., Ex. A-3 at 567-68.)  Petitioner had no alibi during the time period when authorities believe the murder was committed.  (Id., Ex. A-6 at 1145-47.)

On the afternoon of July 30, petitioner called the Osage County Sheriff's Office and reported the victim missing.  He remarked to Sheriff Fowler that, "whoever had done it had to be strong."  Later that day he made the statement to a friend, Stacey Medlock, that, "someone must have gotten crazy drunk and went and killed her."  (Id., Ex. A-3 at 554.)  Moreover, while police were conducting an aerial search of the area surrounding the victim's house, petitioner told his great-aunt, "I don't think they'll find anything down there."  (Id., Ex. A-3 at 565.)

On Sunday, August 1, 1993, an unidentified female body was found in the Mari-Osa Delta.  Sheriff Fowler went to the victim's house to inform her family of this.  While everyone else began to cry when they learned the news, petitioner looked "very surprised and very shocked" and began rapidly tapping his foot.  (Id., Ex. A-4 at 743.)

At the time of his arrest for the murder, petitioner was found with a loaded rifle in his car and a knife taped to his leg.  After his arrest, a Missouri Highway Patrolman interviewed petitioner who said he knew who had killed his mother but that no one could prove it.  The officer told petitioner that his own mother was deceased also, which was a lie.  The officer told him that he could speak to his mother and that she could forgive anything.  Petitioner then began to cry and said, "I'm sorry.  I'm just sorry."  (Id., Ex. A-6 at 1028-32.)

While evidence described in petitioner's habeas corpus petition may or may not cast suspicions on his guilt beyond a reasonable doubt, the court is limited on review "to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318 (1979).  Given the breadth of circumstantial evidence, with no reasonable rebuttal offered, the evidence was sufficient to permit a rational trier of fact to find petitioner guilty beyond a reasonable doubt.

Accordingly, Ground 1 is without merit.


**B.    Ground 2**

Petitioner alleges his defense counsel had a conflict of interest because he represented the victim's husband in probate proceedings, while he represented petitioner in the murder case. "[W]here a constitutional right to counsel exists, [our] Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." Parker v. Parratt, 662 F.2d 479, 483 (8th Cir. 1981), cert. denied, 459 U.S. 846 (1982). "It must also be acknowledged, however, that joint representation of multiple defendants with conflicting interests by a single attorney is not per se violative of constitutional guarantees of effective assistance of counsel." Id. "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 349-50 (1980) ("[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.").

Petitioner argues that trial counsel operated under a conflict of interest. While Ted Helmig was not a co-defendant, he had been a suspect in the victim's murder. During the course of trial counsel's representation of petitioner on the murder charges, he was also representing Ted Helmig with probate matters related to the victim's estate. According to petitioner, this led counsel to vigorously pursue the theory that the victim's death was an accident rather than showing evidence that cast suspicion on Mr. Helmig.

During the hearing on petitioner's post-conviction relief motion, trial counsel admitted he represented both petitioner and Ted Helmig simultaneously; however, he did not feel there was a conflict because they were father and son and would presumably be "on the same side." (Doc. 7, Ex. G at 277.) Moreover, Ted Helmig signed a written waiver of conflicts containing, inter alia, a notice that he may be suggested as the victim's murderer during the course of trial and that he waived any attorney-client privilege in counsel's representation of Dale; in fact, Ted Helmig paid for petitioner's representation. (Id. at 146-47, 215.) Trial counsel did not obtain such a waiver from petitioner, and

he further testified that he never specifically told petitioner he
represented Ted Helmig, but he believed petitioner was aware of the
situation. (<u>Id.</u> at 216.) Petitioner's wife at the time of the hearing,
Patty Lammers, testified at the hearing that she was present when
petitioner met with trial counsel and that he never informed petitioner
he was representing Ted Helmig and they had no knowledge of this. (<u>Id.</u>
at 180.)

Petitioner claims that trial counsel was ineffective due to his
failure to pursue evidence and theories contrary to Ted Helmig's
interest. To this end, petitioner alleges that trial counsel did not
submit as evidence handwritten notes from the victim in which she states
that Ted Helmig had been abusive to her in the past and she feared that
he would be again and, therefore, carried a gun. Moreover, the victim
had filed affidavits in her divorce proceedings from Ted Helmig alleging
that he had been abusive to her, and she obtained a temporary
restraining order against him. Trial counsel also did not present to
the jury the fact that, at the time of the victim's death, Ted Helmig
was facing a motion for contempt of the restraining order arising from
an incident at the Country Kitchen restaurant where he threw hot coffee
in her face. Trial counsel omitted evidence that Ted Helmig would have
benefitted financially from the victim's death, and the fact that at the
time of her death he was required to pay the victim $733 a month, half
of his monthly income. Trial counsel also did not introduce into
evidence the fact that, on the night of the victim's death, Ted Helmig
sat at the other end of the bar watching her drink beer with another
man, in violation of the protective order.

On appeal from the denial of petitioner's post-conviction motion,
the Missouri Court of Appeals found sufficient evidence supporting the
circuit court's findings that petitioner was aware that trial counsel
was representing Ted Helmig in probate proceedings,[3] that trial counsel

---

[3]Counsel testified during the Rule 29.15 hearing that during his
initial contact with petitioner Ted Helmig was present. Petitioner and
Ted Helmig contacted counsel to obtain his services to get access to the
victim's house, vehicle and property, which had been "sealed" by law
enforcement after her death. At the time of this visit, counsel
(continued...)

introduced evidence regarding Ted Helmig's motive and opportunity,[4][5] and that the omitted evidence petitioner relied on was otherwise inadmissible during trial. Helmig, 42 S.W.3d at 671-72.

At the Rule 29.15 hearing, trial counsel testified that prior to petitioner being charged with the murder, both he and Ted Helmig came to his office to obtain his assistance in securing the victim's automobile from the police. (Doc. 7, Ex. G at 279.) Counsel further testified that, when petitioner and Ted Helmig came to his office for estate matters prior to formal charges against petitioner, it was apparent that petitioner was a suspect in the investigation and it was generally understood that he would represent him in the criminal matter. (Id. at 274-77.)

---

[3](...continued)
testified that all three parties were aware petitioner was a suspect in the murder, and that counsel would represent him if charges were brought. Ted Helmig signed an acknowledgment of services agreeing to pay for petitioner's legal fees and showing an understanding that petitioner was the client and that he may be implicated as a suspect during the defense. Counsel further testified that petitioner was aware that he was representing Ted Helmig in probate matters. Helmig, 42 S.W.3d at 680-81; Doc. 7, Ex. G at 215, 240-41, 273-78.

[4]During trial, counsel presented the fact that the victim had a restraining order against Ted Helmig to prevent him from selling marital property, which he attempted to sell, that Ted Helmig threw coffee at the victim approximately two weeks prior to her death and told her "I'm going to have an end to this once and for all," that Ted Helmig was at the American Legion Hall at the time the victim was there, and on the same day she went missing, that the sheriff had considered Ted Helmig a suspect, and that Ted Helmig had no alibi for the night in question. Helmig, 42 S.W.3d at 671-72; Doc. 7, Ex. A-3 at 507; Ex. A-4 at 781, 787, 799; Ex. A-5 at 810, 839; Ex. A-6 at 1164.

[5]Petitioner proffered evidence that, allegedly, Ted Helmig would profit financially from the victim's death, that the restraining order also worked to physically restrain Ted Helmig from contact with the victim because he had been physically abusive in the past, that the victim was afraid of Ted Helmig so she carried a firearm, that Ted Helmig was in violation of the restraining order, that Ted Helmig was acting "strangely" at the victim's funeral, that Ted Helmig pleaded the Fifth Amendment when asked to give a statement to the sheriff, and that Ted Helmig and the victim were in the middle of a hostile divorce at the time of her death. Helmig, 42 S.W.3d at 671.

Despite petitioner's arguments that trial counsel failed to cast suspicion on Ted Helmig, at trial counsel stated in his opening statement, and later elicited witness testimony, that the victim had a restraining order against Ted Helmig and that they were involved in a bitter divorce. (Doc. 7, Ex. A-2 at 245; Ex. A-4 at 780-81, 799.) Moreover, counsel elicited testimony that Ted Helmig saw the victim on the night of the murder; that Ted Helmig had been a suspect in the murder; that Ted Helmig had, just prior to the victim's death, thrown hot coffee in her face in a public restaurant and said he was "going to have an end to this once and for all;" that Ted Helmig declined to provide a written police statement regarding the murder; and that Ted Helmig's claim that he was at home during the time period the victim was murdered was not independently verified. (Doc. 7, Ex. A-4 at 799; Ex. A-5 at 810, 839.) In his closing argument, trial counsel opined that the only real suspicion on petitioner was that his whereabouts could not be verified on the night in question, and that the same suspicion could shine on Ted Helmig. (Doc. 7, Ex. A-6 at 1164.)

With regard to the admissibility of excluded evidence, the appellate court found that the evidence would not have been admissible. Helmig, 42 S.W.3d at 671 (citing State v. Butler, 951 S.W.2d 600, 606 (Mo. 1997) (en banc)). The appellate court noted that while "[e]vidence which has no other effect than to cast bare suspicion on another is not admissible," a defendant may introduce evidence that another person had an opportunity or motive to commit the crime charged, if there is proof the other person "committed some act directly connecting him with the crime." Helmig, 42 S.W.3d at 671.

The appellate court's conclusion was reasonable that none of the evidence petitioner proffers directly ties Ted Helmig to the crime, but merely casts further suspicion on him. Petitioner is incorrect in characterizing the exclusion of such evidence at trial as violative of his constitutional rights. Petitioner points to no Supreme Court precedent, and the court finds none, which states that excluding such evidence under the instant facts and circumstances would violate

petitioner's due process rights.[6]   Moreover, trial counsel managed to introduce substantial evidence of the acrimonious divorce, Ted Helmig's status as a suspect, and his lack of a verifiable alibi.   While this was certainly not all the evidence available to cast doubt and suspicion on Ted Helmig in the hope of deflecting the same away from petitioner, "the Constitution's guarantee of effective representation does not require an attorney to submit any minimum amount or particular type of evidence." Johnson v. Lockhart, 921 F.2d 796, 800 (8th Cir. 1990).   The record does not indicate that any alleged conflict of interest affected the performance of petitioner's counsel.

Therefore, Ground 2 is without merit.

## C.   **Ground 3**

Petitioner's third claim is that trial counsel rendered ineffective assistance in several respects.   In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court defined ineffective assistance of counsel under the Sixth and Fourteenth Amendments.   The Strickland test requires federal habeas corpus relief, if it is shown that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686.

There are two elements to a claim of ineffective assistance of counsel.   A habeas petitioner must first demonstrate that counsel's performance fell below an objective standard of reasonableness.   Id. at 687-88.   In this regard, petitioner must overcome a strong presumption that counsel rendered constitutionally effective assistance.   Id. at 690; Blackmon v. White, 825 F.2d 1263, 1265 (8th Cir. 1987).   Counsel's strategic choices made after thorough investigation are virtually unchallengeable, and decisions following less thorough, but nevertheless reasonable, investigation are to be upheld to the extent that they are supported by reasonable judgment.   Strickland, 466 U.S. at 690-91.

---

[6]Regarding the admission of evidence, the Due Process Clause of the Fourteenth Amendment is implicated only if the alleged acts deprive the petitioner of a fair trial.   Harris v. Bowersox, 184 F.3d 744, 752 (8th Cir. 1999); Hobbs v. Lockhart, 791 F.2d 125, 127-28 (8th Cir. 1986).

The second element of the _Strickland_ test requires that a habeas petitioner demonstrate actual prejudice resulting from counsel's dereliction of duty.  _Id._ at 687.  The test for prejudice requires that petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  _Id._ at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  _Id._


**1. Ground 3A**

Petitioner's first claim is that trial counsel was ineffective for failing to present the testimony of alibi witnesses.  During trial, the state capitalized on the fact that petitioner was last seen at 10:45 p.m. on July 28, and was not seen again until 4:00 p.m. on July 29.  With no witness to testify as to his whereabouts for this 17-hour time frame, the jury was left to muse over whether petitioner really spent the night at a hotel in Fulton or whether he left and murdered the victim.  Petitioner claims that trial counsel should have called Steve and Linda Asher, Mary Neal, Tiffany Jones, Carolyn Morgan, Tom Stout, and Evert Helmig to testify on his behalf.

At the outset, petitioner claims the Missouri Court of Appeals relied on an improper standard in rendering its decision, _i.e._, petitioner is not entitled to relief because he failed to show it was "impossible that he is the guilty party." _Helmig_, 42 S.W.3d at 670.  Upon review of the appellate court decision, the court finds petitioner's argument is misguided.  While the opinion quotes the passage petitioner refers to, the appeals court was merely referencing the legal meaning of the term "alibi." _See_ _Helmig_, 42 S.W.3d at 670 (quoting _Williams v. State_, 8 S.W.3d 217, 220 (Mo. App. 1999)) (quoting _State v. Hopkins_, 947 S.W.2d 826, 828 n.1 (Mo. App. 1997)) (quoting Black's Law Dictionary 66 (5th ed. 1979)).  Both the Missouri Court of Appeals's decision and relevant case law clearly reference _Strickland_ as the standard for ineffective assistance of counsel review.

Trial counsel had a duty to petitioner to consider his alibi defense and to investigate all witnesses who allegedly possessed

knowledge concerning his innocence or guilt.  Lawrence v. Armontrout, 900 F.2d 127, 130 (8th Cir. 1990).  A review of the evidence does not support a finding that trial counsel breached that duty.  Since petitioner did not name the Ashers or Carolyn Morgan as alibi witnesses in his Rule 29.15 proceedings, he is procedurally barred from naming them in this federal habeas corpus action.  "We will not review claims that appear for the first time in a federal habeas corpus petition unless the petitioner can show adequate cause for his failure to raise them in state proceedings and actual prejudice from the alleged constitutional violations, or he can demonstrate that failure to review a claim would result in a fundamental miscarriage of justice."  Sherron v. Norris, 69 F.3d 285, 289 (8th Cir. 1995) (citing Coleman v. Thompson, 501 U.S. 722, 750 (1991)).

Petitioner does not assert any cause for his failure to name these witnesses; so, the court need not address prejudice.  See Coleman, 501 U.S. at 750.  Furthermore, although he claims actual innocence, he cannot demonstrate that the failure to hear from these witnesses would constitute a fundamental miscarriage of justice.  To prevail on the fundamental miscarriage of justice exception, petitioner must produce "reliable new evidence not available at trial establishing that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."  Amrine, 238 F.3d at 1028.  "Evidence is new only if it was not available at trial and could not have been discovered through the exercise of due diligence."  Id.

The testimony of these witnesses would clearly not be new evidence nor would it have been impossible to find.  Moreover, their testimony would not undermine the outcome of the trial. Steve and Linda Asher last saw petitioner when he left their home on July 28 and cannot provide an alibi for him during the time that the victim was murdered.  (Doc. 26 Exhs. at 137-40.)  Carolyn Morgan also cannot provide an alibi; the most she can attest to is that petitioner planned to spend time with the victim and his children that weekend.  (Id. at 154-55.)  Since neither Steve and Linda Asher nor Carolyn Morgan can provide an alibi for petitioner during the relevant time frame, it would not result in a

fundamental miscarriage of justice for petitioner to be procedurally barred from naming them.

Trial counsel was not ineffective for failing to call Tiffany Jones, Mary Neal, and Tom Stout, because their testimony only accounts for petitioner's whereabouts before or after the crime. Cooley v. Nix, 738 F.2d 345, 347 (8th Cir.), cert. denied, 469 U.S. 1089 (1984) (counsel was not ineffective for failing to call alibi witness who would not have supported defendant's whereabouts at the time of the crime). Tiffany Jones and Mary Neal saw petitioner in the Wal-Mart store in Fulton no later than 9:00 p.m. on July 28 and could not ascertain his whereabouts during the critical time period. (Doc. 26 Exhs. at 143-46.) Similarly, Tom Stout stated that he saw petitioner at his restaurant in Jefferson City, Missouri, first around 10:30 a.m. and then later around 3:00 or 4:00 p.m. on July 29. (Id. at 159-60.) This evidence would do little to help the defense, since the trial evidence indicated that the victim died during the early hours of July 29, from one to six hours after her last meal at 12:30 a.m. on the day she died. (Doc. 7, Ex. A-2 at 392-93; Ex. A-5 at 910.)

Trial counsel was also not ineffective for failing to call Evert Helmig to testify at trial. The trial court found that Evert Helmig, a cousin of Ted Helmig and a neighbor of the victim, was not a credible witness due to his tendency to be easily manipulated. [7] (Doc. 7, Ex. H at 102.) On appeal from the denial of the Rule 29.15 motion, the Missouri Court of Appeals declared that it was bound by the trial court's factual decision. This court must defer to state court fact findings, except in certain circumstances. "28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Marshall v. Lonberger, 459 U.S. 422, 434 (1983). Moreover,

---

[7]Evert Helmig provided two affidavits. On November 13, 1998, he stated that, at 2:30 a.m. in the morning of the day in question, he saw headlights shine from the victim's carport just like every time she parked her car in the past. In his affidavit dated December 9, 1998, he stated that, even though he could not be sure the headlights he saw belonged to the victim's car, he did not see petitioner's car. (Doc. 26, Exhs. at 162-64.)

Evert Helmig's affidavit, which only states that he lives across the road from the victim's house and did not see petitioner's car the night of July 28-29, does not provide an alibi. See Eldridge v. Atkins, 665 F.2d 228, 236 n.5 (8th Cir. 1981) (counsel does not have a duty to call witnesses she reasonably believes will not help her client).

Therefore, Ground 3A is without merit.

### 2. Ground 3B

Petitioner argues that trial counsel was constitutionally ineffective for failing to investigate and present evidence to refute the state's "knew too much too soon" theory. Specifically, petitioner says trial counsel should have: (1) cross-examined Stacey Medlock to put his statements into context; (2) presented testimony from Stacey Medlock that his conclusions regarding the victim's keys were innocent; (3) presented evidence to show that petitioner's failure to participate in the search on Saturday, July 31, was not "suspicious"; and (4) investigated his statement about the victim's nightgown.

Respondent argues that petitioner is procedurally barred from bringing claims that trial counsel should have elicited the testimony of Stacey Medlock, because he did not raise them on appeal of his Rule 29.15 motion. See Reese v. Delo, 94 F.3d 1177, 1181 (8th Cir. 1996) (holding that failure to raise claim in post-conviction appeal is considered abandonment of the claim), cert. denied, 520 U.S. 1257 (1997). Petitioner argues he did raise the issue of Stacey Medlock's testimony in his post-conviction relief appeal. (Doc. 7, Ex. I at 4-9, 16, 33, 42.)

While petitioner referenced Stacey Medlock's testimony in his post-conviction motion (id., Ex. H at 30) appeal (id., Ex. I at 15, 32-33), both respondent and the Missouri Court of Appeals noted that such information, because it was not presented in the "points relied on" section and merely presented in the argument portion of the petitioner's brief, was not properly preserved for appellate court review. See Helmig, 42 S.W.3d at 666 n.1; Boatmen's Bank of S. Mo. v. Foster, 878 S.W.2d 506, 509 n.4 (Mo. App. 1994) ("An appellate court is obliged to determine only those questions stated in the points relied on. Issues

raised only in the argument portion of the brief are not preserved for review."). Nevertheless, the Missouri Court of Appeals discussed matters related to petitioner's arguments. Helmig, 42 S.W.3d at 674-77. The court finds that petitioner sufficiently raised these issues in post-conviction proceedings; therefore, the court will address the merits of his claims.

Petitioner alleges that Stacey Medlock would have testified on cross-examination that: (1) when petitioner stated "someone must have gotten crazy drunk and went in and killed her," he was referring to Ted Helmig; (2) petitioner believed Ted Helmig may have been involved in the murder; (3) petitioner was looking forward to spending time with the victim, and he asked Medlock to go home with him to meet the victim; (4) petitioner told her "well I guess I'm going to have to call the sheriff. . . ."; (5) other family members also suspected foul play and were just as concerned for the victim's safety as petitioner;[8] and (6) petitioner innocently surmised that the victim's keys were in her purse when he was unable to locate them.

At the post-conviction hearing, trial counsel testified that Stacey Medlock had given potentially exculpatory statements prior to trial regarding petitioner asking Medlock to meet the victim, that other relatives were concerned about the victim's whereabouts, that petitioner remained hopeful that the victim was going to turn up alive, and that petitioner said at one point that he was going to have to call the police. (Doc. 7, Ex. G at 254-59.) However, trial counsel also testified that he believed Stacey Medlock's testimony was inconsistent with what was recorded on an audiotape, the transcript of the audiotape, her testimony at the preliminary hearing, and her testimony at trial. (Id. at 254.) Trial counsel further testified that "Stacey Medlock was a crack addict and would say almost anything at any given time." (Id. at 255.)

"[T]o prevail on his claim of ineffective assistance of counsel, defendant must overcome the presumption that counsel's challenged acts

_____

[8]One police theory was that petitioner's statements that he suspected foul play before anyone else indicated his responsibility for the killing. (Id. at 256.)

or omission were sound trial strategy." <u>Williams v. Bowersox</u>, 340 F.3d 667, 669 (8th Cir. 2003) (citing <u>State v. Starks</u>, 856 S.W.2d 334, 336 (Mo. 1993) (en banc)).  Upon doing so, petitioner must then show that trial counsel's tactics were both unreasonable and prejudicial to his defense.  <u>Strickland</u>, 466 U.S. at 687-88.

"The choice of witnesses and defense tactics are ordinarily matters of trial strategy and will not support a claim of ineffective assistance of counsel." <u>Williams</u>, 340 F.3d at 669.  While trial counsel does not explicitly state his motives for failing to elicit particular information on cross-examination of Stacey Medlock, it is implicit in his hearing testimony that he believed her credibility was in question.  And, in support of his arguments, petitioner does not challenge trial counsel's testimony regarding Stacey Medlock's alleged variations in testimony and alleged use of illegal drugs.

Arguably, Stacey Medlock's testimony at trial to the facts suggested by petitioner may have placed his statements in a particular context and been of some benefit to his defense.  However, even if trial counsel's performance in this regard fell below that of the objective, reasonable attorney, there is no clear indication that but-for this particular tactic the outcome would have been different.  <u>See</u> <u>Strickland</u>, 466 U.S. at 694.

The fact that Stacey Medlock believed petitioner was innocent is not so persuasive as to be reasonably outcome determinative.  Moreover, the fact that petitioner said that someone must have gotten crazy drunk and killed the victim contemporaneously with his concerns that Ted Helmig may be involved is not, of itself, reasonably probable to affect the outcome.  Moreover, the fact that petitioner believed Ted Helmig may have been the perpetrator does little to support the inference that petitioner was not.

While Stacey Medlock stated that petitioner made statements about contacting the sheriff, she also asserted that, after making such statements, he went on to eat a meal and told her that he was going to wait forty-five minutes before calling the sheriff in case his mother was only out with a friend. (Doc. 26, Exs, Ex. 38 at 203-04.)  This proposed testimony does little to counteract Dorothy Bauer's statement

that petitioner had to be cajoled into calling the sheriff (he had to be asked three times) (Doc. 7, Ex. A-3 at 487); just because the petitioner said he was going to call the sheriff does not necessarily mean he intended to do so. Similarly, the fact that petitioner expressed a desire to see the victim on the weekend does not support a finding of innocence.

Regarding petitioner's statement that the victim's keys were in her purse, he alleges that Stacey Medlock could have testified that he made that statement after looking for the victim's keys and failing to find the keys or come across her purse while searching. He implies this evidences an innocent motive for his assessment that the victim's keys would be found in her purse, as they later were. However, this proposed testimony does not refute that of Dorothy Bauer that the victim always wore her keys on a belt clip and not in her purse.[9] (Doc. 29, Ex. A-3 at 499.) Moreover, the fact that other family members were concerned about the victim's whereabouts does not, of itself, detract wholly from petitioner's actions. Accordingly, it cannot be said that this evidence is so exculpatory as to successfully defeat the state's inferences at trial regarding petitioner's correct assessment of where the victim's keys would be found.

For these reasons, any proposed errors in failing to elicit particular testimony on cross-examination of Stacey Medlock were not prejudicial to petitioner's defense.

At trial, the state pointed out to the jury that petitioner did not come to the crime scene on July 31 to help look for the victim. Petitioner argues that trial counsel should have used the testimony of

---

[9]In his amended petition, petitioner refers to the hearing testimony of Ted Helmig that he never observed the victim wear her keys on her belt. (Doc. 7, Ex. G at 134.) However, petitioner does not specifically allege that the failure to elicit testimony from Ted Helmig on this point at trial amounted to ineffective assistance of counsel. Accordingly, the court does not further review this issue. On this issue, the Missouri Court of Appeals found that trial counsel would have had sufficient strategic reasons for not having Ted Helmig testify, including not wanting to appear inconsistent to the jury by presenting some evidence of his motive and opportunity to commit the crime, and at the same time presenting him as a credible witness. Helmig, 42 S.W.3d at 676.

Richard Helmig, his brother, and Deputy Backues, on this point. During the time of the victim's murder, petitioner was also going through a divorce. After a lengthy custody battle, he had been awarded visitation of his children for that weekend. According to petitioner, Richard Helmig and Deputy Backues told him not to bring his children to the house. The appellate court noted that the trial court found Richard Helmig to be incredible. (Doc. 7, Ex. H at 93.) Therefore, petitioner "did not rebut the presumption that the decision not to call Richard Helmig was sound trial strategy." Helmig, 42 S.W.3d at 676-77. As previously stated, it is not for this court to redetermine credibility. See Marshall, 459 U.S. at 434.

Turning to Deputy Backues, the appellate court reasoned that it was not ineffective assistance of counsel to not elicit testimony from Backues, because it was in evidence that Dale was with his children that morning and it was "common sense" that the children should not be at the search scene. Helmig, 42 S.W.3d at 677. Under Strickland, it cannot be said that the failure to elicit this testimony from Deputy Backues is so patently unreasonable as to establish a reasonable probability the outcome would have been different.

Regarding petitioner's statements about the nightgown, the fact that petitioner not only knew that Ms. Helmig would be in her nightgown, but also which exact one, was used as evidence against him at trial. (Doc. 7, Ex. A-3 at 483, 495, 500; Ex. A-6 at 1143-44.) Petitioner contends that trial counsel was ineffective for failing to use the testimony of Lisa Baysinger, Dorothy Bauer, and Velda Party to show that he was not the original source of the knowledge. Petitioner argues that Lisa Baysinger could testify that she did not hear about the nightgown until the sheriff mentioned it. The motion hearing court found that Lisa Baysinger was incredible due to her bias. (Doc. 7, Ex. H at 94.) As mentioned above, it is not the province of this court to redetermine credibility. See Marshall, 459 U.S. at 434.

With regard to Dorothy Bauer, the fact that she remarked that the victim would have been wearing a nightgown does little to belie testimony that petitioner came to the same conclusion, but also correctly identified which nightgown she was wearing when her body was

recovered. Similarly, Velda Party merely would have confirmed that
Dorothy Bauer believed the victim was in her nightgown. (Doc. 26 at
147-48.) It was, therefore, not error for the appellate court to
conclude that the failure to elicit this testimony does not reflect
ineffective counsel bearing on the outcome of the case.

Therefore, Ground 3B is without merit.

### 3. Ground 3C

Petitioner claims counsel was ineffective for failing to
investigate and introduce evidence that he and the victim had a close,
loving relationship thereby undermining the state's theory of motive.
Petitioner alleges that witness testimony[10] could have established that
he had a good relationship with the victim, that he gave the victim
money, that the victim was assisting petitioner in obtaining visitation
with his children, that the victim never expressed concern about living
with petitioner, that the victim considered petitioner her "favorite,"
that petitioner had previously expressed care and concern for the
victim's safety, and that the victim did not complain about giving
petitioner money.

The appellate court determined that the trial court did not err in
finding that Steve Asher, Linda Asher, and Carolyn Morgan were not shown
to have been known to trial counsel or could have been located for
trial. Helmig, 42 S.W.3d at 673. Petitioner does not challenge this
factual determination in his habeas corpus petition, and a review of the
record does not reveal any information to the contrary. Battle v.
Armontrout, 814 F. Supp. 1412, 1419 (E.D. Mo. 1993) ("[C]ourts have
consistently held that if an attorney has no notice, or scant notice,
that a witness exists, he is not ineffective if he fails to investigate
that witness, or fails to call that witness to testify. Furthermore,
it is the movant's burden to establish that the witness could be located
through reasonable investigation, that he would have testified if he had

---

[10]Petitioner asserts that the following witnesses should have been
investigated and called to testify: Richard Helmig, Ted Helmig, Randy
Goben, David Boes, Evert Helmig, Jim and Tom Stout, Steven and Linda
Asher, Carolyn Morgan, and Linda Baysinger.

been called as a witness, and that his testimony would have provided a viable defense.") (internal Missouri law citations omitted).

Regarding the additional proposed witnesses, the appellate court noted that Richard Helmig, Evert Helmig, and Linda Baysinger were deemed incredible by the trial court and, therefore, trial counsel was not constitutionally ineffective for failing to produce their testimony. Helmig, 42 S.W.3d at 673. Randy Goben, David Boes, Jim Stout, and Tom Stout testified by affidavit, and those affidavits were not submitted to the appellate court; therefore, error with respect to their testimony was not properly preserved. Helmig, 42 S.W.3d at 672. Regardless, the court reviewed the petitioner's claims as if they were properly preserved.

The court of appeals found that, essentially, the relevant evidence presented at trial did not show a pattern of quarrelsome behavior as petitioner suggests, but instances where petitioner and the victim either argued or evidenced discord, and that these instances are largely unrefuted by petitioner. Helmig, 42 S.W.3d at 673.

Trial counsel testified that he specifically chose not to introduce contrary evidence because he believed the state's case lacked a theory, its evidence of a poor relationship between petitioner and the victim was incredible, and the state failed to produce a strong motive. (Doc. 7, Ex. G at 234-36.) Trial counsel believed that to introduce such evidence to refute the state's claim would lend credence to it in the jury's eyes. The appellate court agreed that this was reasonable trial strategy and did not support a claim for ineffective assistance of counsel. Helmig, 42 S.W.2d at 673.

Whether or not the court agrees with a particular strategy trial counsel employed, it is not its province to determine what trial tactics are or are not likely to be successful. See Knott v. Mabry, 671 F.2d 1208, 1212 (8th Cir. 1982) ("Human nature is such that most people think they have a better understanding of the demands of an event after it has happened. Trial of law suits is peculiarly susceptible to hindsight appraisal of another lawyer's endeavors."). The court's review is limited to determining whether trial counsel's method was unreasonable and prejudicial. The court finds it was not.

While trial counsel did not contact or interview many of the petitioner's proposed witnesses, his strategic decisions are still entitled to some deference to the extent they are reasonable.  <u>See</u> <u>Strickland</u>, 466 U.S. at 690-91.  In this case, none of the proposed witnesses would have provided a direct contradiction for the state's evidence that the parties had quarreled over a phone bill and that the victim had on at least one occasion mentioned she would not continue to provide petitioner with financial assistance.  Moreover, because trial counsel did not believe this evidence supplied petitioner with a motive, it was not entirely unreasonable to allow the jury to come to a conclusion without presenting additional evidence.  <u>Cf.</u> <u>Johnson</u>, 921 F.2d at 800 ("[T]he Constitution's guarantee of effective representation does not require an attorney to submit any minimum amount or particular type of evidence.  Since the government has the burden of proving guilt beyond a reasonable doubt, it may not be necessary for the defense to introduce evidence to meet the constitutional requirement of effective representation.").

The Missouri Court of Appeals' determination that introducing the proffered evidence would not have, in all reasonable probability, altered the outcome, is reasonable.  As the appellate court noted, the fact that petitioner generally had a good relationship with the victim was never really challenged at trial; the state did not produce evidence of long-standing acrimony.  There is simply no evidence on the record or reasonable inference that, had the jury heard direct evidence petitioner and the victim maintained a close relationship, the jury would have reasonably concluded he was not responsible for the murder. <u>Cf.</u> <u>United States v. White</u>, 341 F.3d 673, 677-78 (8th Cir. 2003) (even if representation is substandard, prejudice cannot be presumed; because counsel did not completely fail to participate in the proceedings, his alleged shortcomings did not rise to the level necessary to presume prejudice).

Accordingly, Ground 3C is without merit.

**4.  Ground 3D**

Petitioner alleges that trial counsel failed to investigate and present evidence implicating Ted Helmig as the victim's murderer. The appellate court found that trial counsel did introduce some evidence at trial tending to cast suspicion on Ted Helmig as a suspect. However, the court further noted that evidence tending only to cast suspicion on a suspect's motive and opportunity is not otherwise admissible absent direct evidence the suspect was involved in the crime. <u>Helmig</u>, 42 S.W.3d at 671; <u>State v. Leitner</u>, 945 S.W.2d 565, 572 (Mo. App. 1997); <u>State v. Umfrees</u>, 433 S.W.2d 284, 287-88 (Mo. 1968) (en banc).

As this court discussed in detail regarding Ground 2, <u>supra</u>, the evidence petitioner refers to does not directly implicate Ted Helmig in the murder and, much like the evidence against petitioner, is circumstantial and related to motive and opportunity. Moreover, while trial counsel did not attempt to introduce all the available evidence that Ted Helmig could be involved in the crime, he did interject into the record, without objection, that Ted Helmig may be a suspect with motive and opportunity, in an effort to cast reasonable doubt on petitioner's guilt. Accordingly, while arguably relevant, the failure to introduce such evidence does not support a finding of ineffective assistance of counsel.

Ground 3D is without merit.

### 5. Ground 3F

Petitioner alleges that, but-for trial counsel's failure to conduct a reasonable investigation and make reasonable strategic choices, he would have been acquitted. Specifically in his amended petition, petitioner alleges that trial counsel's strategy to proffer a defense of accidental death was patently unreasonable, and the trial court's conclusion that trial counsel's tactic was reasonable trial strategy is also unreasonable. Moreover, petitioner alleges that trial counsel's statements during the trial were unreasonably inflammatory and irrelevant and, therefore, prejudicial. [11]

---

[11]Ground 3F differs from that presented to the Missouri Court of Appeals where petitioner alleged in Ground 3F that "[h]ad counsel
(continued...)

A review of petitioner's Rule 29.15 appeal to the Missouri Court of Appeals shows that he did not specially assert this ground in his points relied on. Petitioner referenced trial counsel's defense strategy and statements in the argument section of Ground 3. To this end, the appellate court noted that it was not properly preserved for appellate review. Helmig, 42 S.W.3d at 668 n.3. Nevertheless, for the reasons discussed regarding Ground 3B, supra, this court will review the merits of petitioner's claim.

Petitioner's first allegation is that counsel rendered constitutionally ineffective assistance for pursuing a defense of accidental death from a drug or alcohol overdose in light of a laboratory report showing the victim had neither drugs nor alcohol in her system at death. Petitioner further argues that in pursuing this defense, counsel neglected his duty to investigate and pursue other potential defenses.

While the trial court found that the issue of counsel's defense theory was not properly reviewable, the court went on to conclude that "[t]rial Counsel made a legal argument suggesting that the state had not shown *corpus delicti* based on the fact that the medical examiner could not testify to the cause of death." Helmig, 42 S.W.3d at 668 n.3.

During the post-trial hearing, counsel testified that "[t]he theory of the defense was there was no evidence sufficient to even meet the *corpus delicti* standard, let alone proof beyond the reasonable doubt, if such is a theory." (Doc. 7, Ex. G at 217.)

In relevant questioning, trial counsel testified as follows:

> Q:    [Attorney O'Brien for petitioner] With respect to the corpus delicti theory of the case, can you explain to the Court what that theory was? How did you--What was your assessment of the State's ability to prove corpus delicti?

---

[11](...continued)
performed competently, there is a reasonable probability that the jury's verdict would be different because of the strong showing that appellant is innocent." (Doc. 7, Ex. I at 41-43.) The appellate court found that Ground 3F was not properly reviewable because it was merely conclusory and did not challenge any alleged trial court error. Helmig, 42 S.W.3d at 666 n.1.

A:    [Trial Counsel Jordan] Well, the corpus delicti would be death of a human being and human agency involved in that death.  There was the death of a human being.  The human agency aspect was never shown.

Q:    And what evidence did you develop in support of that theory?

. . . .

A:    The deposition of Dr. Dix, the medical expert, as well as his testimony at trial, which Dr. Dix issued the--was a State's witness, of course, and to a reasonable degree of medical certainty he was unable to determine the cause of death.    Among    possibilities    was    accidental    death. Specifically, the possibility of an accidental death due to drug overdose was consistent with what he found on autopsy and was reported in his autopsy report.

Q:    Now, how--Given that theory of the case, how do you explain the concrete block that was found tied to Ms. Helmig's body?

A:    Well, now we're shifting to the elements of a crime rather than the corpus delicti.  Would you like me to--

Q:    Well, actually in--in terms of human agency, I mean, that implies some human agency does it not?

A:    Well, yes.  But I believe it's the tail wagging the dog.

Q:    And so how would you explain the body landing in the river with a concrete block tied to it in a way  that is not consistent with homicide?

A:    I'll answer that question.  I'm not sure that I ever felt that that was an answer that needed to be presented.  However, it was known that [the victim] drank, that she saw other men, that she was addicted to various pain medications.   And the possibility of an accidental death occurring, perhaps, in the presence of someone else who's good name, reputation, whatever could be compromised, could be a situation leading to disposing of a body in a manner such as the body was found.

The unusual thing about the circumstances of [the victim's]--how she was found, there was a--I believe the evidence was pretty consistent there was a very thin, blue nylon rope that [would] have been suitable for attaching a small anchor or a rowboat sort of like thing, one strand around her with one block, with one fishermen's knot which could be released with one pull.

Her body being found that way, together with the autopsy report of Dr. Dix and Dr. Dix's examination, which showed no indentations about the body where a rope might have been tightly, indicated, I believe, pretty strongly that she was deceased before the river or whatever--no one knows precisely, obviously, the answer to that question, but I believe it was consistent with her having expired somewhere else and somehow being put into the river.  I don't see how she could have been found in such a condition if she had been thrown from any height whatsoever.

Q:  So the theory--I mean, if the State says these-- that the fact she's found in a river with a block tied to her indicates unequivocally that she was murdered, you would contest that and say that that's not necessarily so, there's another explanation for how she could have gotten in the river.  Is that fair?

A:  That's fair.  I believe it's the tail wagging the dog again.  You know it's - -

. . . .

Q:  Okay.  And you contacted a physician I believe, and presented evidence regarding the medication that [the victim] was taking; is that correct?

A:  An expert witness was hired, who reviewed all medical--quite a few medical records from different physicians, for years for [the victim].

Q:  All right.  And am I correct, the purpose of calling him was to offer the jury another plausible explanation for how [the victim] might have died, that being--

A:  Accidental death.

Q:  --accidental death?  So that, whoever was with her when she died did not deliberately kill her, but simply must have panicked and thrown the body in the river?  Was that--

A:  Well, again, that goes back to the corpus delicti. And whether she was with someone or not, or was discovered, perhaps, later by someone, I'm--that would be conjecture. I didn't present a specific theory on that.  The relatives of [the victim], of course, did testify that she was dependent on her pills, would go nowhere without them.

Q:  Uh-huh.  With respect to your theory of the case, were there laboratory reports used against you to try to counter that theory?

A:    Yes.

Q:    And did those include toxicology reports of tests done of [the victim's] liver?

A:    Yes.  I think it would be inaccurate to say of the liver.  There was a liver slice.

Q:    Correct.  And what did those test [sic] reveal?

A:    To me, they were flawed--that they're so flawed they revealed nothing.  But the bottom line of the test,  as offered by the, I believe his name is Mr. Johnson, the chemist, was that no drugs--trace of drugs, even breakdown metabolites of drugs were found in that liver slice.

Q:    Uh-huh.   And were you aware--Did you raise problems with respect to the reliability of the liver slice?

A:    Yes.

Q:    And  on  what  basis  did  you  challenge  the reliability fo the slice?

A:    The original records had marks where--cross-out marks where additions, subtractions had been made.  Control numbers had been changed from what would be on the  original printout.  The fact that Dr. Dix's autopsy report  showed no liver sample being obtained as a result of that.

In addition to Dr. Dix's, I believe, testimony on the stand as well at deposition, that some person had contacted him after the autopsy--he was not sure who--with the suggestion there might have been drug involvement, a toxicology test should be run.  It seemed to be all after the fact.  Dr. Dix himself saw no need on an original autopsy to request toxicology results be offered.  And matter  of fact, he himself was unsure how the liver from which the liver slice was taken managed to make it to the laboratory where it was analyzed.

Q:    All right.  But you had substantial evidence that [the victim] was addicted to drugs and taking a quantity of medication at or near the time of her death, is that right?

A:    Oh, I would say definitely.

Q:    Yeah.

A:    Three  important  aspects  were  the  family's testimony; some State's witnesses; the medical records; the expert, Dr. Newcomb; and the fact that her purse, found

several months later, actually did indeed contain controlled substance medications.

> Q:    Did the liver toxicology report damage your case?

> A:    Yes.

> Q:    And can you explain how?

> A:    It was used in order to totally refute Dr. Newcomb's testimony, as well as the relatives' testimony as to--If I can back up for just a second.  Dr. Dix, on examination, had testified that, on autopsy, the condition of [the victim's] death could have been attributable to accidental means.  That's part of the reason why he just didn't know what the cause of death was.  But it would have been consistent with a drug overdose type of thing, slowing respirations, all the rest of that.

> Q:    So--

> A:    And the fact that the State was able to, more or less, brandish the report stating that there were no drugs in her system at the time of death--

> Q:    Uh-huh.  They essentially--

> A:    --pretty well, I think as Kelly Holshof said, trumped the other evidence.

> Q:    Eliminated any other non-homicide explanation for her death?

> A:    Exactly.  Dr. Newcomb was a nice fellow, but he wasted the [jury's] time and the Court's time.

(Doc. 7, Ex. G at 218-34.)

Essentially, it was counsel's theory that, because the state could not prove the exact cause of death, it did not meet its burden to prove that the victim's death, as opposed to the disposal of her body, was at the hands of another person; i.e., petitioner.  Counsel's theory did not take into consideration, however, that the state's toxicology report found no trace of drugs or alcohol in the victim's liver.  Despite counsel's statements that he found the state was less than forthcoming in providing the defense with discovery, petitioner alleges, and the record fails to show contrary evidence, that trial counsel was provided with a toxicology report in routine discovery prior to trial.  (Doc. 26 at 37 n.24.)

The court must determine whether or not "counsel's performance was unreasonable as viewed in the totality of the circumstances[.]" Schaeffer v. Black, 774 F.2d 865, 867 (8th Cir. 1985); Yeager v. Kemna, Slip Copy, 2005 WL 1421776, at *3 (W.D. Mo. Jun. 17, 2005). It is not within the court's purview to judge counsel's actions as against what would have, in its opinion, been the most supportable or successful defense, but rather to determine whether counsel's actions were a product of objectively reasonable judgment. Strickland, 466 U.S. at 690-91.

Viewing the totality of the circumstances as presented by the parties' proffers and the record, the court finds trial counsel's conduct did not fall below an objective standard of reasonableness. The state's medical examiner could not state with certainty that asphyxiation was the cause of death. And it is ultimately the state's burden to prove every element of the offense. Jones v. United States, 526 U.S. 227, 264-65 (1999). Defense counsel's choice to present alternative causes of death not encompassing human agency was not unreasonable. "[S]trategic choices made *after thorough investigation of law and facts relevant to plausible options* are virtually unchallengeable." Strickland, 466 U.S. at 690 (emphasis added).

It was reasonable on the facts and circumstances of this case to offer evidence that the victim's death may have been as a result of an accidental drug and/or alcohol overdose. Evidence was presented showing that the victim had access to a large amount of prescription medication, that she occasionally drank alcohol, and that the combination of such medication and alcohol could prove fatal. (Doc. 7, Ex. A-2 at 342-52, 356-57, 365-80, 389-90, 396, 404; id. Ex. A-3 at 409; id. Ex. A-6 at 1082-90, 1109, 1112, 123.) However, the state presented evidence in its case-in-chief that the victim's liver sample tested free of alcohol and drugs. The defense's expert witness asserted that the victim could have died from an alcohol or drug overdose. Trial counsel testified that he believed the laboratory findings were flawed, and he attempted to challenge their accuracy by noting at trial some problems with numbers on the documents and chain of custody. Despite these challenges, counsel himself admitted in the post-trial hearing that this laboratory

report harmed the defense case. (Doc. 7, Ex. G. at 234.) Although the laboratory report indicated the victim did not have drugs or alcohol in her system when she died, trial counsel tested this evidence and produced an expert whose testimony he knew was directly contradicted by the state's toxicology evidence. Trial counsel clarified this strategy by stating that the victim may have died accidentally in the presence of someone who, for whatever reason, made a conscious decision to dispose of the body.

Even if trial counsel's choice of defense fell below an objective standard of reasonableness, the court must determine whether, but for his actions, there is a reasonable possibility the outcome would have been different. See Strickland, 466 U.S. at 694. The court finds it would not.

There is no evidence of record to support the determination that there is a reasonable probability the verdict would have been different had defense counsel not opted for this particular defense. The state's case was entirely circumstantial and nothing about the state's evidence or burden to prove the elements of the crime was altered by the chosen defense. At the end of the trial, the jury still had the same evidence before it that it would have had regardless of counsel's defense tactic. Counsel's choice of defense in this case simply was not of the type which arguably had a reasonable probable effect on the outcome.

Petitioner argues that, had counsel not pursued this defense, he would have pursued more reasonable and effective defenses, such as "the legitimate alibi defense." This contention is wholly speculative and not supported by the record. See U.S. v. Acty, 77 F.3d 1054, 1060 (8th Cir. 1996). As discussed previously, none of petitioner's proffered alibi witnesses can account for his whereabouts during the suspected time of death. Therefore, even if counsel had traveled this avenue, it is not reasonably probable the jury would have reached a different destination.

Because counsel's defense theory neither detracted from nor bolstered the state's case that petitioner had the motive, opportunity, and means to commit this crime, the court cannot reasonably conclude that the defense theory prejudiced the ultimate outcome.

Accordingly, in this regard, counsel did not render ineffective assistance.

With respect to trial counsel's statements at trial, petitioner argues that counsel's statements referring to petitioner as a "jerk" and "bum," as well as counsel's reference to "satellite photography from outer space" and "Israeli secret service agents" during opening statement were prejudicial to his defense. (Doc. 7, Ex. A-2 at 248; Ex. A-6 at 1153, 1166.) Moreover, petitioner believes counsel's references and testimony regarding the discovery and condition of the victim's body were unreasonable and prejudicial, in addition to his asking Sheriff Carl Fowler whether he believed there was evidence supporting petitioner's guilt. (Doc. 7, Ex. A-5 at 809; A-6 at 1065, 1156, 1165, 1169, 1171.)

While some of counsel's statements were arguably unorthodox, they were not, of themselves, sufficiently unreasonable and prejudicial to change the outcome of the case. Trial counsel referred to secret service agents and satellite photos from outer space[12] during opening statement (Doc. 7, A-2 at 248); however, he made these references in the context of the case against petitioner being based on "lies, cover-ups, [and] weirdness." (Id.) To this extent, it appears trial counsel was attempting to make a dramatic point about what he perceived to be the bizarre nature of the case against his client; there was no obvious prejudicial effect.

Similarly, trial counsel's references to petitioner as a "jerk" and a "bum" during closing statement were, contextually, not sufficiently prejudicial. Counsel called petitioner a "jerk" when referring to the fact "He wants to get going on things, wants to get the investigation going, find out what happened. And the more he asked questions the more he becomes suspect #1 . . . ." (Doc. 7, Ex. A-6 at 1164.) Arguably, trial counsel was attempting to explain petitioner's behavior for the jury, and why that behavior may have drawn suspicion. With respect to

---

[12]Moreover, during the post-trial hearing, trial counsel noted that there were press releases regarding this case that referenced satellite photography showing the path of the victim's body during river flooding. (Doc. 7, Ex. G at 264-65.)

calling petitioner a "bum," it appears counsel was referencing petitioner's employment difficulties and receiving money from the victim. (Id. at 1166.) While counsel may have chosen other words and inferences, it cannot be said that either of these references were outcome determinative.

Petitioner also objects to counsel asking Sheriff Fowler whether he believed there was evidence against the petitioner. It is not entirely clear why trial counsel chose to highlight for the jury why Sheriff Fowler believed petitioner may be guilty of the charged offense. Nevertheless, the court finds it was not sufficiently prejudicial. Sheriff Fowler was involved in the investigation of the murder and petitioner's arrest. It is not reasonable to conclude that the fact he believed evidence pointed to petitioner's guilt was new or shocking to the jury so as to lead to the reasonable probability that, but for his testimony, the result would have differed. Given Sheriff Fowler's connection to the case and his status as a state's witness, the jury would likely have formed the opinion he believed petitioner was guilty absent this particular testimony.

Lastly, petitioner argues that trial counsel was ineffective for introducing evidence of the condition and recovery of the victim's body. Petitioner alleges that counsel described how the victim's "bloated and decomposed body" was recovered from the river, elicited the details of the victim's post-mortem condition on cross-examination, and showed the jury a video recording of the recovery of the body.

As aforementioned, in order to succeed on a claim of ineffective assistance of counsel petitioner must overcome the presumption that counsel's tactics amounted to reasonable trial strategy. Williams, 340 F.3d at 669; Mills v. Armontrout, 926 F.2d 773, 774 (8th Cir. 1991). The only direct reference in this regard during the post-trial hearing was counsel's testimony that:

> [I]t became painfully obvious, even after the preliminary hearing, that the finding--the pictures of Norma as found were--was the most important feature, rather than how it came that she was in that situation. That, I guess, is human nature, and everybody's belief that if somebody ends up in a situation like that, something bad had to have happened to cause it.

> And it's not a pretty sight, it was a horrible sight.
> But the fact of the matter is, there was no proof or
> connection of how it got there--how she got there. And
> that's the tail wagging the dog.

(Doc. 7, Ex. G at 290-91.)

While trial counsel was not asked to testify why he chose to introduce evidence and videography related to the recovery and condition of the victim's body, it is not for the court to automatically assume he had no underlying trial strategy. The state had introduced photographs of the body and the scene in its case-in-chief. (Id., Ex. A-2 at 274-82.) It would not have been unreasonable to show the gruesome images as a way for the jury to consider that petitioner was not a "bad person" and could not have done this to the victim. See Testimony of Trial Counsel, id. at 289 ("This was a bad person case."). In closing, counsel attempted to desensitize the jury to the facts of the victim's body's appearance in calling on the jury to hold the state to its burden regarding the responsibility for her death. (Doc. 7, Ex. A-6 at 1165-66, 1171.)

Regardless of trial counsel's strategy, or lack thereof, the court does not find that the images prejudiced the ultimate outcome. The jury was aware evidence existed that another person was at least minimally involved in the victim's death and/or disposal of her body, i.e., concrete block tied to her body, and that she was found in the river several days after the time she allegedly died.

Finally, the defense evidence of the recovery and condition of the body was cumulative of the state's evidence.

For all the aforementioned reasons, Ground 3F is without merit.


**D.    Ground 4**

Petitioner argues that his right to a fair and impartial jury was violated when the jurors in his case were exposed to inflammatory press coverage and prosecution and witness media interviews during recess from court proceedings. Specifically, petitioner alleges that trial counsel testified during the post-conviction hearing that the media attention during the trial was "extensive," and that he witnessed both the prosecutor and trooper Robert Westfall giving an interview outside the

courtroom in both the presence and hearing of jurors. (Doc. 7, Ex. G at 266-67, 270.) Moreover, news reporter Ryan Yamamoto testified at the hearing on the motion for a new trial and for judgment of acquittal that he observed interviews being conducted near the courtroom. (Id., Ex. A-7 at 13-18.) Petitioner's wife at the time of trial, Patty Lammers, testified that she saw media persons, jurors, witnesses, and family members congregating together in the same area of the courthouse, and that she saw jurors within the proximity of media interviews. (Id., Ex. G at 187-88.)

This ground was raised in the petitioner's post-conviction motion. The denial of relief on this ground was raised on direct appeal. (Doc. 7, Ex. C at 36-37, 70-83.) The Missouri Court of Appeals denied relief. (Id., Ex. E at 6-7.) Petitioner also raised the ground in his motion for post-conviction relief as an instance of alleged ineffective assistance of counsel. (Id., Ex. H at 79-85.) The Missouri Court of Appeals denied relief:

> In movant's motion for new trial, defense counsel raised the issue of improper prejudicial publicity, alleging that jurors and news media were together in the hallway. At the hearing on this motion, defense counsel called as witnesses the local media coordinator, a television reporter who covered the trial, a newspaper reporter who covered the trial, and the sheriff who had custody of the jurors.
>
> The issue of television interviews in the rotunda was extensively litigated in the hearing on the motion for new trial, which the trial court thereafter denied. The issue of media presence also was raised in the direct appeal and decided adversely to movant. It cannot be relitigated in a post-conviction proceeding by transforming it into a claim for ineffective assistance of counsel. State v. Suter, 931 S.W.2d 856, 868 (Mo. App. 1996). See also Mallett, 769 S.W.2d at 83. Point V is denied.

Helmig, 42 S.W.3d at 682-83.

The Supreme Court has made clear that "[f]ew, if any, interests under the Constitution are more fundamental than the right to a fair trial by 'impartial' jurors, and an outcome affected by extrajudicial statements would violate that fundamental right." Gentile v. State Bar of Nev., 501 U.S. 1030, 1075 (1991); see e.g., Sheppard v. Maxwell, 384 U.S. 333, 350-51 (1966); Turner v. Louisiana, 379 U.S. 466, 473 (1965). "The failure to accord an accused a fair hearing violates even the

minimal standards of due process." <u>Irwin v. Dowd</u>, 366 U.S. 717, 722 (1961) (citing <u>In re Oliver</u>, 333 U.S. 257 (1948)).

Petitioner's trial counsel testified during the post-conviction hearing that there were many media representatives at the court, and that he witnessed media interviews with the prosecutor and witnesses regarding their testimony and other factors of the case. (Doc. 7, Ex. G at 266-69.) Trial counsel further testified that the interview with Trooper Westfall was loud and any juror would have been able to hear the interview. (<u>Id.</u> at 308-09.) Similarly, Patty Lammers testified that she observed media interviews within the proximity of people she recognized as jurors. (<u>Id.</u> at 188.)

Ryan Yamamoto testified that he was present at the court for one day, and he interviewed the prosecutor in the rotunda during a lunch break. Regarding this interview, he testified that "there was no one in the rotunda at the time when [he] [conducted] the interview." (Doc. 7, Ex. A-7 at 12.) He further testified that he witnessed two news outlets conducting interviews in a "side room or side area" and not in the rotunda. (<u>Id.</u> at 13.) With respect to these interviews, Mr. Yamamoto stated that, while people were in the rotunda, no one else (except the news media and interviewees) were in the side area. (<u>Id.</u>) Mr. Yamamoto also observed what he believed to be camera crews filming in the direction of jury members. (<u>Id.</u> at 14.)

Newspaper reporter Steven Friedman was present at the trial from March 4 to March 9, 1996, essentially the entire time the court heard testimony. (<u>Id.</u> at 23-24.) Mr. Friedman testified that he never specifically observed any media interviews in the rotunda area outside the courtroom. (<u>Id.</u> at 22.) He further testified that it was possible that jurors would be in the same area as the media during court breaks. (<u>Id.</u>)

The record also shows that during trial the court reminded the jurors that they had been instructed about their conduct during recesses, including that they should not read, view, or listen or discuss anything that has to do with any opinion in this case until it is finally given to them to decide. (Doc. 7, Ex. A-6 at 1040, 1137.) See <u>Tunstall v. Hopkins</u>, 306 F.3d 601, 609 (8th Cir. 2002) (citing <u>Jones</u>

v. United States, 527 U.S. 373, 394 (1999) ("Finally, in the absence of contrary evidence, we presume . . . that jurors will follow court admonitions to avoid media coverage regarding a case upon which they are sitting.")).

There is no evidence before this court or any previous reviewing court that the atmosphere was so media-saturated that the jury was unable to comply with the court's instructions despite their best efforts. Petitioner's proffer merely indicates that media representatives were present at the courthouse and that at certain times during the proceeding jurors, members of the media, and other interested persons were all in the same vicinity. There is simply no evidence that jurors overheard or were exposed to any statement or information that may have biased them in any way so as to be inherently prejudicial to the fundamental fairness of petitioner's trial.

Accordingly, the court finds there was no misapplication of established law and that the state court decision on Ground 4 was reasonable in light of the presented facts.

Ground 4 is without merit.

**E.   Ground 5**

Petitioner alleges that trial counsel was ineffective for failing to object to the "prejudicial use of evidence that petitioner at the time of his arrest was in possession of weapons unrelated to the offense." (Doc. 26 at 74.)

Sergeant Cynova testified at trial that, when he went to arrest petitioner, he was informed that petitioner was heavily armed and heading toward "Osage County with whatever on his mind." Trial counsel objected to this testimony as hearsay, but the court overruled the objection stating that it could be used to explain subsequent police conduct. Helmig, 42 S.W.3d at 678. Sergeant Cynova further testified that he was informed petitioner had on his person a rifle, large caliber carbine, .44 caliber firearm, a 4-inch filet knife taped to his leg, and possibly a shotgun. Trooper Westfall testified that he was informed petitioner could be violent and that he was going "to seek a confrontation with the sheriff." Id.

On cross-examination, Sergeant Cynova testified that petitioner stopped for the police without the patrol car having its lights on, he did not resist arrest, and he was polite, cooperative, assistive and "not in the least bit antagonistic." Id. Moreover, he testified that petitioner's only statement at the time of arrest was "you guys are making a big mistake." Id.

The appellate court determined that petitioner failed to overcome the presumption that trial counsel made a strategic choice in failing to make a specific objection. Id. at 678-79. The court noted that "[f]ailing to object to objectionable evidence does not establish ineffective assistance of counsel unless the evidence resulted in a substantial deprivation of the accused's right to a fair trial." Id. at 678. The appellate court found no record evidence that trial counsel's failure to object should be characterized as anything more than trial strategy. Id. 678-79.

To succeed on his claim of ineffective assistance of counsel, petitioner must show that it is reasonably probable that the outcome would have been different had trial counsel challenged the relevant testimony. See Strickland, 466 U.S. at 690; Jackson v. Gammon, 195 F.3d 349, 354 (8th Cir. 1999). And "[g]enerally, trial strategy and tactics 'are not cognizable in a federal habeas corpus proceeding.'" Mills v. Armontrout, 926 F.2d 773, 774 (8th Cir. 1991) (citing Comer v. Parratt, 674 F.2d 734, 737 (8th Cir. 1982)).

During the post-conviction hearing, trial counsel stated that he decided not to object to particular matters that may alienate the jury. Despite this strategy, counsel did object to Sergeant Cynova's testimony that petitioner was heavily armed and heading toward Osage County with whatever on his mind, and the objection was overruled. (Doc. 7, Ex. A-6 at 1005.) As the appellate court noted, after his initial objection, trial counsel "would have had no reason to believe the court would sustain the objection if he objected again and could reasonably have concluded that another objection would emphasize and highlight the unfavorable testimony." Helmig, 42 S.W.3d at 679; Seehan v. State of Iowa, 72 F.3d 607, 610 (8th Cir. 1995) (en banc) (noting that counsel

may refrain from objecting to testimony to not risk alienating the jury).

The parties agree that the testimony is admissible as an exception to the hearsay rule to show subsequent police conduct.   State v. Edwards, 116 S.W.3d 511, 533 (Mo. 2003) (en banc).   Petitioner argues, however, that the exception does not apply, if subsequent acts by the police are irrelevant and immaterial to the case, or more prejudicial than probative.   However, petitioner provides no basis for believing that trial counsel's acts were anything other than reasonable trial strategy.   Moreover, as the appellate court noted, the fact that trial counsel obtained testimony on cross-examination that upon arrest he was compliant and non-confrontational arguably diminished any prejudice.

On review, it was reasonable for trial counsel not to object to the subject evidence under the circumstances.   There is no reasonable probability that such action was outcome determinative.   See Strickland, 466 U.S. at 694.   Accordingly, the court of appeals did not err.

Ground 5 is without merit.


**F.    Ground 8**

Petitioner alleges that he was deprived of his constitutional right to assist in his defense, confront witnesses, and make an informed, knowing, and voluntary waiver of his right to testify, because trial counsel provided him with, and instructed him to take, prescription medication during trial.

Patty Lammers testified at the post-conviction hearing that she observed trial counsel give petitioner "[a] white pill that was long, thick." (Doc. 7, Ex. G at 185.)   Ms. Lammers stated that trial counsel gave petitioner these pills every morning, the effect of which was to make petitioner "very weak, tired, lazy-eyed, sort of zombie-like . . . .   He would--could not think clearly." (Id. at 185-86.)   Ms. Lammers, however, could not state with certainty what type of medication petitioner was taking. (Id. at 185-87.)

At the hearing, trial counsel testified that he gave petitioner one pill, which he believed to be his daughter's prescription muscle relaxer, but he later realized was a 600 milligram Ibuprofen tablet.

(<u>Id.</u> at 259.)   Regarding why he gave petitioner the tablet, trial counsel stated it was "with the hope that he would be able to sit stiller, and especially not react to the statements made by the State's witnesses that were not what he believed to be right." (<u>Id.</u> at 259-60.) More specifically, trial counsel testified:

Q.   Now it, it's also been alleged that that [sic] you had Dale taking sedatives during the trial.  Now I believe you testified that you believe you gave him one capsule, or tablet, or pill of--of Ibuprofen?

A.   That's correct

Q.   Okay.  And then you mentioned something about an over-the-counter medication for cramps that your--your daughter has taken in the past.  Is that in addition--

A.   Well, the two are combined.  They're all in one--one little bottle.

Q.   Okay.  And just so I'm clear, did you then--is it my understanding, then, you gave him the Ibuprofen as well as one of these other pills?

A.   No.  Just one pill.

Q.   Okay.  Just the one pill?

A.   Yeah.

Q.   Okay.  And you believe that was Ibuprofen?

A.   It was Ibuprofen.

Q.   Okay.  And why would--

A.   At the time, I thought it was the other thing.

Q.   Why--Oh, is that--Okay.  So if it wasn't, it was the other thing.

A.   Yeah.

Q.   Okay.  What was it that prompted you to give Dale whatever this was you gave him?

A.   The evening before, Dale had been--the evening of--the trial--towards the end of the trial that day, Dale had been--he had been very much agitated by--and probably rightly so, by some of the statements that were being made.  But his reactions to them were angry looks, stomping, turning around

to friends in the courtroom, things that the jury was picking up on that probably would have been better had he just not been able to react. But that--that was Dale.

Q. I guess what I'm--the one question I'm asking is, I'm assuming what you would--

A. His demeanor was not helping him.

Q. I mean, you were concerned about his demeanor in front of the jury?

A. Yes.

Q. Okay. Did you approach Dale about taking some medication, or did he approach you about the medication?

A. Initially, I--I suggested it. He thought it might be a good idea. And then when he asked for more later that evening, I said no.

Q. And so you didn't give him more when he asked for it later?

A. Correct.

Q. Now, did you notice any appreciable change in his demeanor after he--he took the one pill you gave him?

A. No.

Q. And it's been testified to here by others that Dale sat there looking tired and--and disoriented, and like he just wanted a nap throughout the entire trial. Do you recall him acting, or looking, or appearing that way at any time?

A. Just the opposite. Perhaps I did. But--

(Doc. 7, Ex. G at 286-88.)

Dr. Vernon A. Green, retired Chief of Toxicology Services for the University of Missouri-Kansas City, testified by deposition. (Ex. 26, Exs. at 239-48.) Dr. Green testified that the muscle relaxant drug Carisoprodol could cause disorientation, confusion, and agitation in some individuals, especially those taking it for the first time. (Id. at 244.)

The Missouri Court of Appeals found the record did not support petitioner's allegations. The court specifically noted that trial counsel testified he only provided petitioner one pill, and that the

- 51 -

prosecuting attorney testified petitioner was alert and oriented during trial and that he did not appear to be under the influence of medication. Helmig, 42 S.W.3d at 683. Moreover, the court noted that "the [trial] court observed movant during the trial, the hearing on the motion for new trial, sentencing, and during the Rule 29.15 motion hearing. The court expressly found that 'at no time did the Movant appear in any way to be under the influence of any substance, and that at all times, Movant appeared attentive and interested in the proceedings and able to assist in his own defense.'" Id. (quoting Doc. 7, Ex. H at 110.)

Petitioner is correct in his observations that neither the trial court nor the court of appeals noted Dr. Green's testimony regarding the side-effects of the prescription muscle relaxer Carisoprodol. However, the failure to do so does not presumptively support petitioner's position that the appellate court reached a decision that was unreasonable in light of the facts. Neither party directs the court to, and the court did not find on its own review, evidence that the long, thick, white-pill petitioner received was Carisoprodol. In fact, Dr. Green himself never was asked to identify the pill as Carisoprodol, and he testified that Carisoprodol was "pink or blue, something about like that . . . . At one time, I think it was a very large pill, but I think they decreased the size of it." (Doc. 7, Ex. 26, Exhibits at 244.) Dr. Green's testimony, while shedding light on the possible cognitive side-effects of the prescription drug Carisoprodol, does little to advance petitioner's allegations that he was given a muscle relaxer, that the muscle relaxer was Carisoprodol or some similar medication, and that he experienced the side-effects Dr. Green described.

Moreover, even if petitioner was given Carisoprodol, Dr. Green's testimony is in contrast to the observations of trial counsel and the prosecuting attorney. These individuals testified that petitioner was alert, oriented, and appeared to be assisting in his defense.

With respect to whether petitioner should testify in his own defense, trial counsel testified at the Rule 29.15 motion hearing that petitioner was examined by the judge regarding his ability to make the decision not to testify. (Doc. 7, Exs. A-6 at 1042-45; G at 288-90.)

Moreover, had petitioner testified, information about prior offenses, including numerous drug and alcohol related offenses, may have come before the jury, which formed the basis for trial counsel to advise petitioner not to testify. (Id. at 289-90); cf. Rawls v. Mabry, 630 F.2d 654, 661 (8th Cir. 1980) ("[T]he Court will not second guess counsel's judgment when it relates to strategy calculated to benefit the petitioner.").

Petitioner implicitly argues that, because trial counsel testified that he believes he was ineffective for failing to request a mental health evaluation to determine the competency of petitioner to assist in his own defense (Doc. 7, Ex. G at 296), this supports his allegations that he was denied his Due Process rights.

> In order to be competent to stand trial one must have "the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." Drope v. Missouri, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975). Defendant must have "a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and [have] a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 403, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).

Speedy v. Wyrick, 702 F.2d 723, 725 (8th Cir. 1983).

The record is insufficient to indicate that petitioner was not competent or to corroborate counsel's post-trial second-guessing about whether he should have had petitioner evaluated as to his competency. Trial counsel consistently noted that a primary reason for giving petitioner the pill was out of concern for his demeanor in front of the jury, not to make him competent to stand trial. Moreover, the record does not reflect any facts or circumstances that would have required the trial court to question, sua sponte, petitioner's competency. See Speedy, 702 F.2d at 725 (quoting Pate v. Robinson, 383 U.S. 375 (1966) ("[A] due process evidentiary hearing is constitutionally compelled at any time that there is 'substantial evidence' that the defendant may be mentally incompetent to stand trial.")); cf. Beans v. Black, 757 F.2d 933, 935 (8th Cir. 1985) ("Since competency to stand trial is a factual issue, we must presume the state court's findings to be correct unless

they can be faulted for one of the reasons listed in 28 U.S.C. § 2254(d)."). The trial court found petitioner was attentive and interested in the proceedings and free from any influence of medication.

While Patty Lammers testified that petitioner was given the medication every day and it caused him to be drowsy and have difficulty with thought processes, she did not bring this to the attention of the court[13] despite bringing other matters of concern to the court's attention during trial proceedings.[14] Moreover, her testimony is in direct contrast to trial counsel's that he only gave petitioner one pill and refused to provide petitioner with another pill upon his request. (Doc. 7, Ex. G. at 287-88); Hoon v. Iowa, 313 F.3d 1058, 1062 (8th Cir. 2002) ("Under AEDPA, [the federal courts] must give substantial deference to the state court's analysis of the evidence . . . ."); Pittman v. Black, 764 F.2d 545, 546 (8th Cir. 1985) ("The federal court's role is simply to ascertain whether the state court's findings of fact have fair support in the record. Credibility determinations are left for the state courts to decide.") (internal citations omitted).

It is not within this court's purview to redetermine the credibility of the witnesses or draw its own conclusions of the facts. The court's role is limited to determining whether the appellate court's decision was contrary or unreasonable in light of Supreme Court precedent and the record facts. Reviewing the parties' arguments and instant facts, the court cannot determine that the record supports a decision contrary to established law or facts of the case.

Ground 8 is without merit.

**G.    Ground 9**

----

[13]Patty Lammers alleges that she contacted defense counsel and the Missouri Bar regarding this matter after the trial concluded; however, she stated that she received no response from the Missouri Bar. (Doc. 7, Ex. G at 193-94.)

[14]During trial, Patty Lammers informed the court about an alleged incidence of "juror misconduct or prosecutor misconduct." (Doc. 7, Ex. G at 192.) The court recessed the proceedings and conducted an investigation and hearing on the issue, ultimately finding no merit to the allegations. (Id.)

Petitioner alleges that, during jury deliberations, the jurors were supplied with a map, not otherwise introduced into evidence, of the relevant areas in question. A hearing on this ground was held on September 20, 2005. After considering the evidence adduced at this hearing, the court makes the following findings of fact and conclusions of law:

## FACTS

1. At the close of petitioner's trial, the judge instructed the jury "It is your duty to determine the facts and to determine them only from the evidence and the reasonable inferences to be drawn from the evidence." (Doc. 7, Ex. B at 103.)

2. During deliberations, one juror had doubts about petitioner's guilt; specifically, the juror had questions about the distances along the rivers, the directions they flowed, and highways in the area. The juror's questions were not answered by the evidence presented at trial.

3. Other jurors tried to persuade this juror that petitioner was guilty, and tried to supply answers to the questions about the rivers and highways. They were unsuccessful in their attempt to change the juror's mind.

4. At that point, one or more jurors asked for a map of the area, to answer the juror's questions about distances and river flow direction. Someone outside the jury room supplied a map to the jurors. It was a printed roadmap of the area that the juror had questions about.

5. The juror with doubts and some of the other jurors looked at the map. After looking at the map, the juror who had expressed doubts about petitioner's guilt voted with the rest of the jurors to find petitioner guilty.

## DISCUSSION

"A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955); Jones v. Luebbers, 359 F.3d 1005, 1012 (8th Cir. 2004) (quoting Murchison, 349 U.S. at 136); Ryan v. Clarke, 387 F.3d 785, 793 (8th Cir. 2004) (same).

Insuring fairness during the trial process, the Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the
> right to a speedy and public trial, by an impartial jury of
> the State and district wherein the crime shall have been
> committed, which district shall have been previously
> ascertained by law, and to be informed of the nature and
> cause of the accusation; to be confronted with the witnesses
> against him; to have compulsory process for obtaining
> witnesses in his favor, and to have the Assistance of Counsel
> for his defen[s]e.

U.S. Const. Amend. VI. "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." Morgan v. Illinois, 504 U.S. 719, 727 (1992); accord Cooper v. Campbell, 597 F.2d 628, 630 (8th Cir. 1979).

"Jury exposure to facts not in evidence deprives a defendant of the rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth Amendment." Lawson v. Borg, 60 F.3d 608, 612 (9th Cir. 1995). As the United States Supreme Court has noted:

> The requirement that a jury's verdict "must be based
> upon the evidence developed at the trial" goes to the
> fundamental integrity of all that is embraced in the
> constitutional concept of trial by jury.
>
> . . . .
>
> In the constitutional sense, trial by jury in a
> criminal case necessarily implies at the very least that the
> "evidence developed" against a defendant shall come from the
> witness stand in a public courtroom where there is full
> judicial protection of the defendant's right of
> confrontation, of cross-examination, and of counsel.

Turner v. Louisiana, 379 U.S. 466, 472-73 (1965); see also Harold v. Corwin, 846 F.2d 1148, 1150 (8th Cir. 1988) ("[E]xhibits or materials neither in evidence nor used or exhibited before the jury during the conduct of the trial that reasonably can be said to improperly influence the verdict have no place in the jury room.").

There is a presumption of prejudice when extraneous information is considered by the jury. United States v. Cheyenne, 855 F.2d 566, 568 (8th Cir. 1988). This presumption applies if the extrinsic evidence relates to factual issues not developed at trial. Unites States v. Blumeyer, 62 F.3d 1013, 1016 (8th Cir. 1995).

In reviewing this ground for relief, the court is conscious that it is limited in its review "to enforcing the commands of the United States Constitution . . . ." Tunstall v. Hopkins, 126 F. Supp. 2d 1196, 1207 (N.D. Iowa 2000) (quoting Mu'Min v. Virginia, 500 U.S. 415, 422 (1991)).  In the case at bar, facts relating to petitioner's location relative to the victim's home and where the victim's body was recovered were arguably material to assessing the evidence and ultimately petitioner's guilt.  During the trial, petitioner introduced evidence that he was in another town when the victim was killed because rising flood waters prevented passage across the river.  The state presented evidence indicating a time period during which the victim was murdered.  Accordingly, the location of all material individuals, properties, and travel routes were facts crucial to the full assessment of the state's allegations and petitioner's defenses.

This is not merely an instance where the "jury simply supplements the court's instructions of law with definitions culled from a dictionary" and "it remains within the province of the judge to determine whether this conduct distorted the jury's understanding of the law to the prejudice of the defendant." Cheyenne, 855 F.2d at 568.  The state map provided jurors with specific facts by which to adjudge relative locations, distances, travel routes, and terrain.  When the evidence presented at trial did not convince one juror of the petitioner's guilt, that juror's vote changed after viewing the map.

The presumption of prejudice, however, is not absolute and the respondent can rebut the presumption upon establishing facts to show that the extraneous evidence was harmless to the defendant.  Blumeyer, 62 F.3d at 1016-17; Chapman v. California, 386 U.S. 18, 23-24 (1967) ("Certainly error, constitutional error, . . . casts on someone other than the person prejudiced by it a burden to show that it was harmless.").  The test for whether the government overcame the presumption is an objective one, i.e., whether or not the extraneous evidence would have affected the decision of a typical juror.  Blumeyer, 62 F.3d at 1017.  Factors include:

> (1) whether the extrinsic evidence was received by the jury
> and the manner in which it was received; (2) whether it was
> available to the jury for a lengthy period of time; (3)

whether it was discussed and considered extensively by the jury; (4) whether it was introduced before a verdict was reached and, if so, at what point during the deliberations was it introduced; and (5) whether it was reasonably likely to affect the verdict, considering the strength of the government's case and whether it outweighed any possible prejudice caused by the extrinsic evidence.

Id.

In this regard, respondent has not sufficiently rebutted the presumption that the map was prejudicial to petitioner's right to a fair trial. The map was available to the jurors long enough for more than one of them to study it. The map was introduced before the verdict was reached, as one juror was not convinced of petitioner's guilt until after studying the map. Further, the state has not shown that the strength of its case in this matter was so strong that guilt was inevitable despite the use of the map. In fact, until the map was reviewed, one juror was *not* fully convinced of guilt by consideration of the state's evidence at trial.

Even assuming, *arguendo*, a presumption of prejudice does not exist, on these facts, the outcome would not differ. As previously discussed, the map was not introduced into evidence at trial, and the particular contents of the map related directly to facts at issue in the case. "The question of prejudice depends on whether 'there is any reasonable chance that the jury would have been deadlocked or would have reached a different verdict but for the fact that *even one reasonable juror* was exposed to prejudicial extraneous matter.'" <u>United States v. Tucker</u>, 137 F.3d 1016, 1031-32 (8th Cir. 1998) (quoting <u>United States v. Hall</u>, 116 F.3d 1253, 1255 (8th Cir. 1997)) (emphasis in original), <u>cert. denied</u>, 522 U.S. 1140 (1998).

Given the circumstantial nature of the state's case, the fact that the map was introduced prior to the jury's unanimous verdict, the jury's seemingly unfettered access to the map, viewing of the map by more than one juror, and the importance of the map's contents relative to the facts and issues of the case, the court finds there is a reasonable possibility that, but for the extraneous information, the outcome may have been different.

The court is mindful that habeas corpus relief is an extraordinary remedy and should not be granted without thorough review of the facts of the case and applicable constitutional principles.  See Brecht v. Abrahamson, 507 U.S. 619, 633-34 (1993) (quoting Engle v. Isaac, 456 U.S. 107, 126 (1982) ("[T]he writ of habeas corpus has historically been regarded as an extraordinary remedy, 'a bulwark against convictions that violate "fundamental fairness."'")).

After full review and consideration, the court finds that the presumed prejudice of introducing a map not otherwise in evidence during jury deliberations, coupled with the failure of respondent to rebut the presumption of prejudice, substantially affected petitioner's Due Process rights.  See Smith v. Phillips, 455 U.S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it.").

Accordingly, the petitioner's petition for writ of habeas corpus relief is granted.  The judgment of the Missouri Court of Appeals is vacated.  Pending a reasonable opportunity for retrial, petitioner should be discharged from imprisonment.

A writ of habeas corpus is issued herewith.


**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**


Signed on September 26, 2005.